UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------X
                                            :
UNITED STATES OF AMERICA,                   :
                                            :
        -against-                           :         19-CR-472 (PAC)
                                            :
Salvatore Tagliaferro,                      :         OPINION & ORDER
                                            :
                     Defendant              :
                                            :
--------------------------------------------------------X
```

Defendant Salvatore Tagliaferro is charged with soliciting and receiving cash bribes during his tenure as President of Local Chapter 926 of the international labor organization, the United Brotherhood of Carpenters and Joiners of America (the "Union"). Tagliaferro's trial is scheduled to begin on April 5, 2021. He now moves to stay the proceedings and to seek alternative remedies on the ground that he has been deprived of a petit jury drawn from a fair cross-section of the community, in violation of the Sixth Amendment and Jury Selection and Service Act of 1968 ("JSSA"), 28 U.S.C. § 1861 *et seq.* For the reasons set forth below, the motion is **DENIED**.

## BACKGROUND

### I.    Factual Background

In June 2019, Tagliaferro was arrested and charged with criminal acts of bribery when he served as President of the Union's Local Chapter 926. The indictment charges him with: (1) conspiracy to convert labor union property and commit honest services wire fraud, in violation of 18 U.S.C. § 371; (2) conversion of union assets, in violation of 29 U.S.C. § 501(c) and 18 U.S.C. § 2; and (3) honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2. (ECF 2.)

1

Tagliaferro's trial was initially scheduled for May 4, 2020. (Minute Entry dated Nov. 7, 2019.) The COVID-19 pandemic, however, threw a monkey wrench into that plan. Accordingly, the Court granted the Defendant's motion for a continuance and rescheduled the trial date for April 5, 2021. (ECF 114.)

## II.      Defendant's Motion

The Defendant now moves to stay the proceedings and to seek alternative remedies that would restore equitable racial representation across jury venires in the District. (ECF 129.) In support of his motion, the Defendant alleges that he has been deprived of his right to a petit jury drawn from a fair cross-section of the community, in violation of the Sixth Amendment and the JSSA. (Def. Mem. at 1–2, ECF 130.) Specifically, he contends that the Southern District's jury selection plan ("Jury Plan") systematically excludes and underrepresents African American and Hispanic American jurors (*see id.* at 4–12), and that the COVID-19 pandemic has exacerbated these effects with its disproportionate impact on communities of color. (*See id.* at 17–22.)

## III.     The District's Jury Plan

To understand Tagliaferro's claims, it is necessary to orient ourselves to some background knowledge of the District's jury selection process. Under the JSSA, each federal district court must "devise and place in operation a written plan for random selection of grand and petit jurors." 28 U.S.C. § 1863(a). The District's Jury Plan, which has been in existence since 2009, provides the blueprint for the random selection of grand and petit jurors throughout the District. *See Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York* (hereinafter "Jury Plan"), https://www.nysd.uscourts.gov/sites/default/files/pdf/juryplan_feb_2009.pdf.

2

The Jury Plan operates as follows.  Every four years, following the date of the Presidential Election, two master jury wheels are constructed:  one for Manhattan and one for White Plains.  *See id.*  These master wheels, in turn, are filled with names that are randomly drawn from voter registration lists of the various counties that make up the District.  *Id.*  The Jury Plan provides that "the number of names drawn from each county should be proportionate to the number of registered voters in that county."  *United States v. Allen*, No. 20-CR-366 (NSR), 2021 WL 431458, at *1 (S.D.N.Y. Feb. 8, 2021).

The two master wheels draw from a different array of counties.  *See id.*  The Manhattan master wheel randomly draws names from New York, Bronx, Westchester, Putnam, and Rockland, while the White Plains master wheel draws names from Westchester, Putnam, Rockland, Orange, Sullivan and Dutchess.  *See id.*  Because Westchester, Putnam, and Rockland counties are included in both master wheels, the Jury Plan instructs that the names from these counties be "apportioned among the two master wheels to 'reasonably reflect the relative number of registered voters of each county.'"  *See id.*

"Periodically, names are drawn from the master wheels 'in an amount sufficient to meet the anticipated demands for jurors for the next six months.'"  *Id.* (quoting Jury Plan).  Those who are drawn from the master wheels are sent jury questionnaires, which determine whether a person is qualified to serve on a jury.  *Id.*  Jurors who meet the qualification requirements are then placed in the respective qualified wheels for Manhattan and White Plains.  *Id.*  Finally, as "jurors are needed in each courthouse, names are drawn from each qualified wheel and summonses are sent to those individuals."  *Id.*

## IV.   Supplemental COVID-19 Questionnaire

In response to the COVID-19 pandemic, the District has added an extra step to the jury selection process.  Jurors who are drawn from the qualified wheels are sent a Supplemental Juror Questionnaire along with their summonses.  (*See* Def. Mem. Ex. B.)  The Supplemental Juror Questionnaire contains nine questions, which inquire into whether the prospective juror has been infected or exposed to the COVID-19 virus, or has been otherwise affected by the pandemic such that an exemption from jury service is warranted. *See id.*  This screening process aims to prevent the further spread of the COVID-19 virus and to provide exemptions to those individuals who would be most burdened by jury service during the pandemic. *See id.*

## APPLICABLE LAW

## I.   Sixth Amendment

A "representative jury array remains the expression of the community's role in securing" an impartial trial. *Alston v. Manson*, 791 F.2d 255, 256 (2d Cir. 1986).  In recognition of that promise, the Sixth Amendment guarantees a defendant the right to a jury venire drawn from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975).  To establish a *prima facie* violation of the fair cross-section requirement, a defendant must prove each of the following elements:

(1) That the group alleged to be excluded is a distinctive group in the community;

(2) That the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

(3) That this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Demonstrating a *prima facie* violation of the fair cross-section requirement, however, is not enough to prevail under the Sixth Amendment. *Id.* at 367. Under Supreme Court teachings, "States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." *Id.* (cleaned up). Accordingly, the Government may rebut the defendant's *prima facie* case by showing a "significant state interest" behind the jury selection process at issue. *See id.* at 368.

## II.    The JSSA

The JSSA sets forth the Nation's policy that: "all litigants in Federal court entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. The Second Circuit has held that fair cross-section challenges brought under the JSSA must also be analyzed using the Sixth Amendment's *Duren* test. *See United States v. LaChance*, 788 F.2d 856, 864 (2d Cir. 1986). Thus, if a fair cross-section challenge fails under the Sixth Amendment, it also fails under the JSSA. *See id.* ("[B]ecause the *Duren* test governs fair cross section challenges under both the Act and the sixth amendment, our discussion of the statutory challenge also disposes of his constitutional claim.").

In addition to fair cross-section claims, a defendant may also assert other violations of the JSSA if those violations constitute a "substantial failure to comply with its provisions." *Id.* at 870 (cleaned up); *Allen*, 2021 WL 431458, at *4. "Mere technical violations" of the JSSA, however, are not actionable. *LaChance*, 788 F.2d at 864 (cleaned up). "Whether a violation is substantial or merely technical depends upon the nature and extent of its effects on the wheels and venire from which a defendant's grand jury was derived." *Id.* (cleaned up).

5

## APPLICATION

### I.    Fair Cross-Section Challenge

Tagliaferro alleges that the Jury Plan has deprived him of a petit jury drawn from a fair cross-section of the community by systematically excluding African American and Hispanic American jurors. (Def. Mem. at 4–12.) Because his fair cross-section challenge arises under both the Sixth Amendment and the JSSA, he must meet the three-part test set forth under *Duren*. *See LaChance*, 788 F.2d at 870.

Tagliaferro has satisfied the first factor under *Duren* because the groups that he alleges to be unlawfully excluded—African Americans and Hispanic Americans—are considered distinctive groups by the Second Circuit. *See United States v. Rioux*, 97 F.3d 648, 654 ("Rioux has satisfied the first prong of the *Duren* test: Blacks and Hispanics are unquestionably "distinctive" groups for the purposes of a fair-cross-section analysis."); *United States v. Barnes*, 520 F. Supp. 2d 510, 514 (S.D.N.Y. 2007). But this element is as far as he gets under *Duren*. Because the Court holds that Tagliaferro cannot demonstrate *Duren*'s third element, systematic exclusion, his fair cross-section challenge must be rejected.[1]

---

[1] The *Duren* framework is a conjunctive test, meaning that each of its elements must be met in order to establish a *prima facie* violation of the fair cross-section requirement. 439 U.S. at 364. Accordingly, the Court does not need to reach the second *Duren* factor, underrepresentation, because Tagliaferro's claim founders on the systematic exclusion prong. *See, e.g.*, *United States v. Pion*, 25 F.3d 18, 23 (1st Cir. 1994) (rejecting fair cross-section claim on the third element). But even if the Court were to reach that factor, it would find that Tagliaferro fails to satisfy it. The relevant jury venire for comparison here is the Manhattan master wheel because that is the jury pool that "bears the brunt of the defendant's allegations of systematic exclusion." *See United States v. Joshua Schulte*, No. S3 17 CR. 548 (PAC), 2021 WL 1146094, at *4 (S.D.N.Y. Mar. 24, 2021). The relevant community is comprised of the counties that feed jurors to the Manhattan courthouse. *See id.* at *5. Accordingly, under the absolute disparity method, the disparities are 1.34% for African Americans and .04% for Hispanic Americans. (Gov't Mem. at

At the outset, Tagliaferro misunderstands the nature of the inquiry under *Duren's* systematic exclusion prong. He contends that the underrepresentation of African American and Hispanic American jurors *alone* demonstrates systematic exclusion à la the Jury Plan. (Def. Mem. at 9–12.) But this reasoning conflates *Duren*'s underrepresentation element with the systematic exclusion inquiry. *See Rioux*, 97 F.3d at 658. To demonstrate systematic exclusion, the Defendant must isolate specific flaws in the Jury Plan and then prove that those flaws are what caused the underrepresentation at issue. *See id.* Indeed, the Second Circuit elegantly delineated this distinction when it said:

> Without accepting the canard that if you torture the statistics long enough, they'll say anything you want them to, it remains unclear whether statistics alone can prove systematic exclusion. Even if they can, however, they would have to be of an overwhelmingly convincing nature.

*Id.* (citing *United States v. Pion*, 25 F.3d 18, 23 (1st Cir. 1994).)

Accordingly, Tagliaferro's entreaties to statistics do not meaningfully move the needle in regard to the systematic exclusion element, particularly where the disparities at issue are not "of an overwhelmingly convincing nature."[2] *Id.*; *see Anderson v. Casscles*, 531 F.2d 682, 685 (2d Cir. 1976) ("The law is clear that evidence of mathematical disparity, without more, is

---

12, ECF 131.) Because those disparities fall well within the outer limits tolerated in past Second Circuit cases, Tagliaferro cannot meet the underrepresentation element. *See United States v. Biaggi*, 909 F.2d 662, 677–78 (2d Cir. 1990) (holding absolute disparities of 3.6% and 4.7% were insufficient to satisfy *Duren*'s second element); *see also Rioux*, 97 F.3d at 658 (1.58% and 2.14% were insufficient).

[2] Tagliaferro also argues that the case for systematic exclusion is reinforced because the disparities at issue have existed since 1996. But the authority he cites in support of this argument, *United States v. Reyes*, 934 F. Supp. 553, 555 (S.D.N.Y. 1996), in fact rejected a fair cross-section claim based on the District's then-Jury Plan. *See id.* Consequently, the basis for this argument is tenuous at best.

insufficient to make out a prima facie case of improper jury selection."). His systematic

exclusion thesis is thus unpersuasive.

Although Tagliaferro fails to mention any further allegations of systematic exclusion in

his brief, the expert affidavit he has filed therewith does (attempt to) isolate several causes. (Def.

Mem. Ex. C.) The Court is not obligated to go hunting for evidence in favor of either party. But

in the interests of justice and for the sake of completeness, it will address the expert's allegations.

Recently, in *United States v. Schulte*, No. S3 17-CR-548 (PAC), 2021 WL 1146094

(S.D.N.Y. Mar. 24, 2021), this Court examined a substantially similar expert report (indeed by

the same expert) as the one relied on by Tagliaferro here. *See id.* According to this expert, the

Jury Plan systematically excludes African American and Hispanic American jurors by adopting

the following measures:  (1) replenishing the master wheels only once every four years; (2)

solely using voter registration lists to draw prospective jurors; and (3) mailing out juror

questionnaires. (*See* Def. Mem. Ex. C. at 10–12.) The Court is not persuaded by these

allegations.

As an initial matter, the Second Circuit has stated that a jury plan's exclusive reliance on

voter registration lists passes Constitutional muster. *See Schanbarger v. Macy*, 77 F.3d 1424

(2d Cir. 1996) (per curiam) ("[A] jury venire drawn from voter registration lists violates neither

the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of

Equal protection."). So that argument must be rejected.

Additionally, the expert's qualms with (i) the replenishment of the master wheels once

every four years and (ii) the practice of mailing juror questionnaires must also fail under *Rioux*'s

external forces principle. 97 F.3d at 658. These jury selection methods, the expert suggests,

disproportionately affect communities of color because those demographics move more

frequently.  (*See* Def. Mem. Ex. C. at 10–12.)  But therein lies the problem:  the cause of the

exclusion (e.g. people moving) is an external force, not an inherent flaw within the Jury Plan.

*See Rioux*, 97 F.3d at 658; *Schulte*, 2021 WL 1146094, at *7–8.  As Judge Bianco noted,

"systematic exclusion does not occur simply because a facially neutral disqualification criterion

disproportionately impacts a particular group."  *United States v. Barlow*, 732 F. Supp. 2d 1, 40

(E.D.N.Y. 2010), aff'd, 479 F. App'x 372 (2d Cir. 2012).  Therefore, the Court finds the expert's

allegations to be inapposite.

Finally, Tagliaferro also highlights the COVID-19 pandemic's disproportionate effects on

communities of color as further evidence of systematic exclusion.  (Def. Mem. at 17–22.)  Yet,

unfortunate as these effects may be, one cannot seriously dispute the fact that the COVID-19

pandemic is an external force.  *See Schulte*, 2021 WL 1146094, at *8.  Accordingly, the Court

must conclude that the pandemic does not give rise to an inference of systematic exclusion.[3]

In sum, the Defendant's fair cross-section challenge must be rejected under *Duren*'s

systematic exclusion element.

**II.**       **JSSA Challenge**

Next, Tagliaferro raises two claims under the JSSA.  First, he repleads his Sixth

Amendment fair cross-section challenge as also a violation of the JSSA.  (Def Mem. at 14.)  But

given that the *Duren* test governs fair cross-section challenges brought under both the Sixth

---

[3] Tagliaferro states that he is currently gathering additional data about the pandemic's effect on
communities of color and that he may seek leave in the near future to supplement his fair cross-
section motion.  Because the Court cannot provide advisory opinions, it takes no position on the
merits of such a motion.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021) (Roberts, C.J.,
dissenting) (cautioning judges from turning into "advice columnists").

Amendment and the JSSA, *see LaChance*, 788 F.2d at 864, this claim must be dismissed for the reasons provided above. *See supra* 6–9.

Second, Tagliaferro contends that the Jury Plan's exclusion of inactive voters constitutes a "substantial" violation of the JSSA. (Def. Mem. at 14–17.)  Under New York law, voters are designated "inactive" when a county election board receives "information indicating that a voter may no longer be living at her address of registration." *Common Cause/New York v. Brehm*, 432 F. Supp.3d 285, 290 (S.D.N.Y. 2020) (examining New York voting law). There is nothing unlawful about such a policy.  As Judge Roman held in *United States v. Allen*, and with which this Court agreed in *Schulte*, "It is entirely logical for a jury selection process to exclude individuals who have since moved." *Allen*, 2021 WL 431458, at *10; *Schulte*, 2021 WL 1146094, at *10. And "even if the exclusion of inactive voters is a violation of the JSSA, it is certainly a technical violation." *Allen*, 2021 WL 431458, at *10.  Accordingly, the Court concludes that Tagliaferro has not identified an actionable violation of the JSSA.

## CONCLUSION

For the foregoing reasons, the Defendant's motion to stay the proceedings and to seek alternative remedies is **DENIED**.  There will be no further adjournments in this case.  The Defendant will stand trial as scheduled on April 5, 2021.

Dated: New York, New York
      March 29, 2021

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge