UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
:
UNITED STATES OF AMERICA, :
:
   *-against-* : 19-CR-472 (PAC)
:
Salvatore Tagliaferro, : **OPINION & ORDER**
:
   *Defendant* :
:
:
------------------------------------------------------------X

     Defendant Salvatore Tagliaferro moves for a continuance of his trial which is currently scheduled for April 5, 2021, renewing his Constitutional objections to holding an in-person trial during the COVID-19 pandemic. For the reasons set forth below, Tagliaferro's motion is **DENIED**.

## BACKGROUND

### I.   Procedural History

     The Defendant initially raised his Constitutional arguments in support of his first motion to adjourn his trial date, in which he sought an adjournment until "at least January 2021." (*See* Mot. Continue 1, ECF 78; Tagliaferro Mem. 1, 9, 35–49, ECF 79.) At a November 9, 2020 status conference, the Court adjourned the trial date to January 18, 2021. (Min. Entry under ECF No. 96.) Later, Tagliaferro renewed his motion to continue his trial, this time seeking an adjournment until April 2021. (Letter Mot. 1, ECF No. 101.) Before the Court ruled on Tagliaferro's second continuance motion, Chief Judge McMahon issued a standing order adjourning all trials in the Southern District of New York until February 12, 2021. *See* First Amended Standing Order, M-10-468 (CM) (S.D.N.Y. Jan. 5, 2021). In light of that standing

order, the Court adjourned Tagliaferro's trial to April 5, 2021. (Order, ECF No. 114.) Because the Court granted each adjournment that Tagliaferro sought, it did not need to address the Constitutional challenges in support of such motions because they were moot.

On March 28, 2021, Tagliaferro again renewed certain of his Constitutional objections and requested an indefinite continuance of trial. (Letter Mot. 1–3.) The next day, the Court held a final pretrial conference ("FPTC") with the parties and denied Tagliaferro's motion for a continuance on the record. This Opinion and Order follows, and disposes of Tagliaferro's Constitutional objections.

## II. COVID-19 Jury Trial Protocols

In early fall 2020, following New York's considerable progress in flattening the curve of COVID-19 cases, the Southern District commenced comprehensive efforts to resume in-person jury trials in both the Manhattan and White Plains courthouses. As part of those efforts, the District promulgated the 2020 Phased Re-Entry Plan (the "Re-Entry Plan"), which contains a host of COVID-19 related protocols, including: social distancing, mask wearing, hand sanitizing, temperature screening, and daily health questionnaires.[1] *See* 2020-21 Phased Re-Entry Plan (COVID-19) ("Re-Entry Plan"). Moreover, the District also added a Supplemental Juror Questionnaire ("SDNY Questionnaire") to the summons it periodically sends out to prospective jurors each month. (Gov't Mem. Ex. B, ECF 87.) The SDNY Questionnaire asks personal questions related to the COVID-19 virus and seeks to screen out potentially infected and otherwise vulnerable individuals from entering the courthouse. (*Id.*)

---

[1] The Re-Entry Plan is available online at: https://www.nysd.uscourts.gov/sites/default/files/2021-03/phased%20reentry%203.24.pdf. Additionally, a video program of the District's re-opening protocols is available online at: https://www.nysd.uscourts.gov/covid-19-coronavirus.

2

Due to these prophylactic measures, jury trials in the District have been required to undergo changes to both their physical layout and operation. According to the Re-Entry Plan:

> Jury trials are to take place in our largest courtrooms in each courthouse. Jury boxes have been enlarged and juror chairs separated by at least six feet for safe social distancing. Plexiglass dividers are being installed around the witness box and attorney podium, and may be placed elsewhere in courtrooms if recommended by our public health experts. We have installed additional technologies, including HEPA filters, and other air purifying technologies, where indicated by our expert consultants. Counsel tables have been separated to ensure attorneys, litigants, and defendants are properly distanced; seating is limited; some lawyers may have to sit in the gallery. Everyone in the courthouse must remain masked at all times, except for a witness who is testifying.

(*See* Re-Entry Plan, at 5.)

Employing these COVID-19 safety protocols, the first post-pandemic trial in the Manhattan courthouse began on September 29, 2020. Other trials have since followed. Indeed, as Tagliaferro acknowledges, the District has successfully completed six criminal trials to verdict since reconfiguring its courtrooms. (Letter Mot. 2.)

## DISCUSSION

### I. Constitutional Arguments

In support of his motion for continuance, Tagliaferro contends that conducting his trial on April 5, 2021 under the COVID-19 safety protocols set forth in the Re-Entry Plan deprives him of several Constitutional guarantees. Specifically, Tagliaferro argues that holding his trial on its scheduled date will interfere with: (1) his rights of physical confrontation, cross-examination, and jury selection as protected by the Sixth Amendment; (2) his Fifth Amendment Due Process rights; and (3) his right to effective assistance of counsel. The Court will address each challenge in turn.

3

***Physical Confrontation.*** Tagliaferro first contends that the District's mask mandate interferes with his Constitutional right to physically confront witnesses at trial. (Tagliaferro Mem. at 37.) Although witnesses at his trial will be unmasked while testifying on the stand, Tagliaferro asserts that he will still be masked, and accordingly, that his Constitutional right to physical confrontation is violated. (*Id.* at 38.) The Court disagrees.

The Sixth Amendment's Confrontation Clause entitles a criminal defendant to encounter "face-to-face" testifying witnesses. *Coy v. Iowa*, 487 U.S. 1012, 1017 (1988). As the Supreme Court has noted, this right "traces back to the beginnings of Western legal culture" and has, throughout generations, ensured fairness in criminal proceedings—both actual and apparent. *Id.* at 1016–18. But whether, as Tagliaferro argues, requiring a criminal defendant to wear a mask during his trial violates this Constitutional right is an issue that comes before this Court with little guidance in the form of precedent. Nevertheless, after carefully considering the principles implicit in the right to physical confrontation, the Court holds that the District's mask mandate does not violate the right to physical confrontation.

As a matter of first principles, in the two landmark cases to address the issue, *Coy v. Iowa* and *Maryland v. Craig*, the Supreme Court found the right to physical confrontation was implicated because the witness and defendant were completely separated by either a large screen, *Coy*, 487 U.S. at 1020, or one-way closed-circuit testimony. *Maryland v. Craig*, 497 U.S. 836, 842 (1990). Thus, because neither the witness nor the defendant could physically see one another while testimony was being given, that raised concerns under the right to physical confrontation. *Craig*, 497 U.S. at 844; *Coy*, 487 U.S. at 1020. Several years later, in *Morales v. Artuz*, 281 F.3d 55 (2d Cir. 2002), the Second Circuit grappled with the question of whether a witness testifying while wearing sunglasses violated a criminal defendant's right to physical

confrontation. *Id.* at 58. While the Second Circuit did not ultimately decide the issue, it observed in dicta that the sunglasses likely did not pose a Constitutional violation, because the jury could still adequately assess the witness's credibility and because the defendant could still physically encounter the testifying witness. *Id.* at 60–62.

In light of these controlling precedents, the Court is unpersuaded by the Defendant's Confrontation Clause claim. *First*, in contrast to the facts in *Coy* and *Craig* (where total visibility was impaired), any witnesses the Government decides to call at trial will testify in Tagliaferro's actual presence and within his scope of vision. As a result, the testifying witness will be able to perceive Tagliaferro's presence and see his full person, and that will impress upon them the gravity of the proceedings at which they testify. *Coy*, 487 U.S. at 1019 ("A witness may feel quite differently when he has to repeat his story looking at the man whom he will harm greatly by distorting or mistaking the facts. He can now understand what sort of human being that man is.") (cleaned up). *Second*, this case is more akin to the facts in *Artuz*, where the Second Circuit opined that a witness who testified while wearing sunglasses likely did not raise confrontation concerns under the Sixth Amendment. *See* 281 F.3d at 60–62. As the *Artuz* court noted, jurors could still assess the witness's credibility by observing her "body language" and "delivery" and consequently, the court concluded that no physical confrontation issues were implicated. *See id.* The same holds true here. The witnesses at Tagliaferro's trial will remain unmasked and completely visible to both him and the jury. Accordingly, the jury will be able to adequately assess their credibility, and the witnesses, in turn, will be impressed of the gravity of the proceedings at which they testify. Because these are the values behind the Confrontation Clause, and because they are not frustrated by the District's mask mandate, the Court rejects the Defendant's Sixth Amendment claim.

But to the extent requiring Tagliaferro to wear a mask at trial does, in fact, raise physical confrontation concerns, the Supreme Court has said that the right is not indispensable and may give way where "it is necessary to further an important public policy and . . . where the reliability of the testimony is otherwise assured. *Craig*, 497 U.S. at 850. Here, the public policy underlying this District's mask policy is to combat the viral spread of COVID-19. And as Tagliaferro himself acknowledges in over 50 pages in his brief (and again in the present renewed motion), that public policy, by any measure, appears to be an "important" one. *Craig*, 497 U.S. at 850; *see also United States v. Donziger*, No. 11-CV-691 (LAP), 2020 WL 5152162, at *2 (S.D.N.Y. Aug. 31, 2020) (allowing two-way video testimony in light of COVID-19 and concluding that this did not violate the Confrontation Clause). In addition, "the reliability of the testimony" provided at trial is "assured" because witness testimony will be presented in court and developed on cross-examination. *Craig*, 497 U.S. at 850; *see Artuz*, 281 F.3d at 60–62. Accordingly, even if physical confrontation issues are implicated, the District's mask protocol fits comfortably within the public policy exception of the Confrontation Clause and therefore does not offend the Sixth Amendment.

***Cross-Examination.*** Tagliaferro next makes a novel argument based on the right to cross-examination, which is also guaranteed by the Sixth Amendment. He argues that the District's social distancing policy, which will require several members of the jury to sit in the public gallery as opposed to the jury box at trial, unconstitutionally impedes his right to a meaningful cross-examination because affected jurors will be unable to fully "observe the witness's demeanor" at trial. (Tagliaferro Mem. at 39.) The Court is unpersuaded.

Under the Sixth Amendment, a criminal defendant is entitled to a "meaningful" cross-examination. *Alvarez v. Ercole*, 763 F.3d 223, 229–30 (2d Cir. 2014). A cross-examination is

6

meaningful when the jury can look upon the testifying witness at trial and "judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *California v. Green*, 399 U.S. 149, 158 (1970). But the right to cross-examination is not "unfettered"; the trial court enjoys "sound discretion" to impose "reasonable limitations" based on a wide array of concerns. *Id.*; *Brinson v. Walker*, 547 F.3d 387, 394 (2d Cir. 2008).

The District's social distancing policies do not unconstitutionally deprive Tagliaferro of a "meaningful" cross-examination. *See Ercole*, 763 F.3d at 229–30. Throughout trial, the Defendant will have the opportunity to cross-examine any testifying witnesses who will remain unmasked while on the stand. And because witnesses will testify using courtroom microphones, there will be no impediment to audibility for the jurors who are seated in the public gallery. So the jury will have the "full opportunity" to assess witness "demeanor," analyze the substance of any relevant testimony, and make use of "all the other traditional bases for evaluating testimony." *Artuz*, 281 F.3d at 61–62. Tagliaferro's cross-examination claim is thus inapposite.

***Voir Dire.*** Finally, as a hybrid of both his physical confrontation and cross-examination claims, Tagliaferro contends that jury selection will be gravely compromised by the District's requirement that potential jurors remain masked throughout *voir dire*. (Tagliaferro Mem. at 35-37.) Specifically, he contends that he will be unable to adequately assess the credibility and demeanor of masked jurors at *voir dire*, thereby impairing his ability to meaningfully exercise his peremptory challenges. (*Id.*) The Court disagrees. As noted above, despite the District's mask mandate, Tagliaferro is still free to examine and assess juror credibility in all critical aspects besides the few concealed by the wearing of a mask. Indeed, as another court to have recently addressed the same issue explained, "Being able to see jurors' noses and mouths is not essential for assessing credibility because demeanor consists of more than those two body parts

7

since it includes the language of the entire body." *United States v. Trimarco*, No. 17-CR-583 (JMA), 2020 WL 5211051, at *5 (E.D.N.Y. Sept. 1, 2020) (cleaned up). The Court finds this reasoning persuasive.

Additionally, Tagliaferro has been given an opportunity to submit proposed *voir dire* questions for the Court to ask prospective jurors, and an opportunity to respond to the Government's objections. (*See* Proposed *Voir Dire* Questions, ECF 126.) And the Court will do its part in ensuring that the jury eventually empaneled is a fair one. Thus, in view of all these procedural safeguards, the Court is unconvinced that Tagliaferro will be unconstitutionally deprived of a meaningful *voir dire*, let alone an impartial jury, by implementing the District's mask policy.

In rejecting Tagliaferro's physical confrontation, cross-examination, and *voir dire* challenges, the Court is reinforced in its conclusion by the fact that Tagliaferro fails to marshal in support of his cause any ascertainable principle that is rooted in the history and tradition of the Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 43 (2004). As the Supreme Court has said in recent years, the interpretation of the Confrontation Clause is guided in large part by its historical meaning. *Id.* at 42–43 ("The Constitution's [Confrontation Clause] text does not alone resolve this case. . . . We must therefore turn to the historical background of the Clause to understand its meaning."); *accord Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 315 (2009). Yet the Defendant cannot point to any historical understanding of the Confrontation Clause that protects the kind of entitlements he now claims are within its scope. Because this Court cannot uncover an original meaning to that effect either, this historical gloss provides further support for rejecting Tagliaferro's arguments.

***Due Process.*** Given the neurological effects of COVID-19 and the possible effects they may have on an empaneled jury, Tagliaferro contends that holding a trial during the pandemic will violate his Fifth Amendment Due Process rights. (Tagliaferro Mem. at 46; Letter Mot. at 1-2.) In support of this claim, he references medical studies and news reports that explain the possible effects COVID-19 may have on the mental capacities of people who contract the virus. (Tagliaferro Mem. at 46–49.) And on a broader level, he contends that those who have not contracted the virus are also prone to suffering from mental health problems by virtue of the pandemic's effect on society. (*Id.*) All this, he argues, raises "the possibility" that a mentally impaired jury will be empaneled, thereby depriving him of Due Process. (*Id.* at 49.)

The Court is unpersuaded. Mere possibilities do not give rise to Constitutional violations, especially where they are as speculative as those alleged here. Indeed, for Tagliaferro's theory to bear fruit, each of the procedural safeguards that is in place—from the initial SDNY Questionnaire screening process, to jury selection, to the Court's own assessment of juror competency—would have to go awry. Not to mention perhaps the most essential procedural safeguard: prospective jurors' integrity in self-reporting any health or mental incapacities caused by the COVID-19 virus. Thus, while Tagliaferro invites the Court to entertain his parade of horribles and find a Due Process violation at this juncture, the Court declines the invitation. The Court will not assume the worst of our criminal justice system.

***Ineffective Assistance of Counsel.*** Finally, Tagliaferro alleges that holding a trial during the pandemic interferes with his right to effective assistance of counsel. (Tagliaferro Mem. at 41; Letter Mot. at 1–2.) He advances two separate theses: (1) that proceeding to trial in December "pits" defense counsel's health concerns and personal interests against his own interests; and (2) that the District's social distancing measures at trial will physically impair his

9

right to effective assistance of counsel. The claims are meritless.

*First*, the ineffective assistance of counsel issues were resolved at the FPTC, in which the Defendant and his counsel disclaimed any conflict of interest between them. Indeed, upon inquiry by the Government, both defense attorneys affirmed their withdrawal of any prior motions by which they had attempted to withdraw as counsel based on COVID-19 health concerns. Given these representations, the Court finds the FPTC to have settled the conflicts issue.

*Second*, Tagliaferro also advances a different theory of ineffective assistance of counsel based on the District's social distancing measures, which, at trial would prohibit him from sitting with his entire legal team at the same table. (Tagliaferro Mem. at 45–46.) He asserts that this layout renders his right to counsel ineffective (and in violation of the Sixth Amendment) because it impairs on-the-fly communication between members of his defense team.[2] (*Id.*) The claim is meritless. Tagliaferro cannot cite any authority supporting the proposition that the Constitutional right to counsel includes the right of a criminal defendant to have all members of his legal team sitting with him at the same table. Nor is the Court aware of any binding authority holding so. On the contrary, the Court finds the social distancing measure at issue here a permissible accommodation pursuant to the Court's "wide latitude in management of the courtroom." *United States v. Blackwood*, 456 F.2d 526, 529 (2d Cir. 1972). Accordingly, Tagliaferro's ineffective assistance of counsel arguments do not suffice.

---

[2] Tagliaferro anticipates that he will be represented by two attorneys and one paralegal at trial. (Tagliaferro Mem. at 45.)

10

## II.  **Prudential Arguments**

Along with his Constitutional claims, Tagliaferro argues that several prudential concerns related to COVID-19 necessitate an adjournment of trial. His prudential arguments can be grouped into three categories: (1) COVID-19's serious health risks pose too great a risk to safely conduct a trial; (2) Tagliaferro and his counsel suffer from underlying health factors that make them particularly vulnerable to the COVID-19 virus; and (3) the circumstances of this case make it a lower trial-scheduling priority. His arguments are unpersuasive.

*First*, Tagliaferro argues that "New York City also continues to be classified as an area where there is an 'extremely high risk' of getting COVID-19 based upon per capita rates and test positivity," such that the serious health risks posed by the virus weigh in favor of granting an adjournment. (Letter Mot. at 3.) Tagliaferro acknowledges the availability of vaccines but points out that less than 15% of New York State residents have been fully vaccinated. (Letter Mot. 2.) The numbers are somewhat better within New York City, though: 18% of New York City adult residents have been fully vaccinated, and 32% have received at least one dose of vaccine. *COVID-19 Vaccine Tracker*, NYC HEALTH (updated Mar. 30, 2021), https://www1.nyc.gov/site/doh/covid/covid-19-data-vaccines.page. Further, Tagliaferro's jury pool is drawn from New York, Bronx, Westchester, Putnam, and Rockland counties (Mem. & Op. 3, ECF 133), and their residents, respectively, are fully vaccinated in the following approximate percentages: 20%, 13%, 19%, 17%, and 16%. *See COVID-19 Vaccine Tracker*, NYS (last visited Mar. 30, 2021), https://covid19vaccine.health.ny.gov/covid-19-vaccine-tracker. Accordingly, while COVID-19 has not been eradicated, the availability of vaccines helps reduce the risk that COVID-19 presents.

Furthermore, the COVID-19 uncertainties that pervade our society are reasons to accept

11

the status quo as the new normal and move ahead with trial now, as opposed to putting the trial off indefinitely and wishing in earnest for a better future. As previously mentioned, the Manhattan courthouse has held six criminal trials (and seven civil trials) between September 2020 and March 2021, providing strong evidence in support of the conclusion that the District can safely hold trials now, despite COVID-19 uncertainties. Indeed, Tagliaferro himself admits that these trials have successfully contained the spread of COVID-19. (Letter Mot. at 2.)

To be sure, the Court does not discount the grave risks that COVID-19 presents or the countless lives that have been upended and destroyed by this global pandemic. But neither can the Court discount the extraordinary lengths to which this District has gone to ensure a safe and effective re-opening to the general public. In short, the District's prophylactic measures, refined and reworked in consultation with public health experts, in conjunction with New York's ever-increasing vaccine availability, strongly suggest that Tagliaferro's trial should move forward as planned.

*Second*, Tagliaferro contends that his own underlying health factors and those of his counsel weigh in favor of delaying trial. (Tagliaferro Mem. at 51–52; Letter Mot. 1–2.) Tagliaferro suffers from "hypertension, heart disease, and respiratory problems" which place him in a high-risk COVID-19 category. (Tagliaferro Mem. at 51.) Similarly, one member of his defense counsel has also shared under seal with the Court certain underlying health conditions that make him particularly vulnerable to the virus. But one of his attorneys is now fully vaccinated, while the other has received his first vaccine dose and is scheduled to soon receive his second. (Letter Mot. at 2 n.2.) And the interests of justice require trial to move forward without further continuance. Tagliaferro has expressly affirmed his "interest in a comprehensive, thorough, and timely investigation and presentation of his case." (Tagliaferro

12

Mem. at 42.) This important interest, along with the fact that Tagliaferro has worked as a "construction site supervisor" for a New Jersey mall since May 2020 (Letter Mot. 1, ECF 63), demonstrate that he is capable of standing trial now. Furthermore, during his *Curcio* hearing on March 29, 2021, Tagliaferro represented that he does *not* want a continuance, but rather wishes to go to trial.

*Third*, Tagliaferro contends that the circumstances of his case—"a single defendant, white collar case, where the defendant is out on bail, fully compliant with the conditions of his release, and willing to waive his right to a Speedy Trial"—make his case not "worthy of trial scheduling priority." (Letter Mot. at 3; Tagliaferro Mem. at 54.) While the District has expressed a scheduling preference for cases where defendants are in custody, that is merely a preference and nothing more; in the end, the District has given the green light for this trial to proceed in April and whether to do so is fully within this Court's discretion. *See United States v. Bein*, 728 F.2d 107, 114 (2d Cir. 1984) ("The trial judge has broad discretion over the trial timetable.").

*Finally*, the Court disagrees with Tagliaferro's position that holding his trial during the pandemic would "demean the dignity and solemnity of court proceedings" and cause his trial to amount to nothing more than a "spectacle." (Tagliaferro Mem. at 50.) On the contrary, the valiant efforts that have made this trial possible in April 2021—amidst an unprecedented pandemic—exemplify the very best of what our criminal justice system and the rule of law have to offer, and represent the tireless dedication and work by this District's staff, employees, judges and jurors in the pursuit of safely dispensing justice. Accordingly, the Court will proceed as scheduled.

13

## **CONCLUSION**

For the reasons set forth above, the Court **DENIES** Tagliaferro's motion for an indefinite continuance.

Dated: New York, New York
March 30, 2021

SO ORDERED

*[signature]*

HONORABLE PAUL A. CROTTY
United States District Judge