L3TNTAGC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v.                                    19 Cr. 472 (PAC)

SALVATORE TAGLIAFERRO,

                 Defendant.           Conference

------------------------------x

                                       New York, N.Y.
                                       March 29 , 2021
                                       2:40 p.m.

Before:

                    HON. PAUL A. CROTTY,

                                       District Judge

                         APPEARANCES

AUDREY STRAUSS
     United States Attorney for the
     Southern District of New York
BY:  JARROD L. SCHAEFFER
     THOMAS A. McKAY
     Assistant United States Attorneys

MICHAEL K. BACHRACH
RICHARD H. ROSENBERG
     Attorneys for Defendant

L3TNTAGC

1          THE DEPUTY CLERK:  United States of America versus
2    Salvatore Tagliaferro.
3          Counsel for the government, please state your
4    appearances.
5          MR. SCHAEFFER:  Good afternoon, your Honor.  Jarrod
6    Schaeffer and Thomas McKay for the government.  We are joined
7    by Annie Pfeiffer from our office.
8          MR. BACHRACH:  Good afternoon, your Honor.  Michael
9    Bachrach and Richard Rosenberg, for the defendant, Salvatore
10   Tagliaferro.
11         MR. ROSENBERG:  Good afternoon, your Honor.
12         THE DEFENDANT:  Good afternoon, your Honor.
13         THE COURT:  Good afternoon.
14         (Pause)
15         MR. BACHRACH:  I do that often, your Honor, forgetting
16   my mask.
17         THE COURT:  I apologize for my tardiness and failure
18   to bring my facemask with me.
19         Do the government or the defendant have any way they
20   want to proceed?
21         MR. SCHAEFFER:  We are happy to do anything that is
22   easiest for the Court, your Honor, but we think that it
23   probably makes sense to walk through the outstanding motion or
24   the proposed voir dire, and we're prepared to discuss anything
25   that the Court considers relevant.

1        THE COURT:  Mr. Bachrach, Mr. Rosenberg?

2        MR. BACHRACH:  That's fine, your Honor.

3        THE COURT:  All right.

4        Let me take up the fair cross-section motion.  We are

5   going to be issuing an opinion and a report and an order on

6   this today, and we're denying the defendant's motion for an

7   adjournment based on the fair cross-section application.

8        Constitutional challenges to holding the trial during

9   the COVID-19 pandemic.  This continuance motion was filed on

10  September 29, 2020, and raised again on March 28, 2021, raising

11  Fifth and Sixth Amendment challenges re holding trial with

12  COVID-19 safety protocols.  That motion is going to be denied,

13  and we will have an opinion for you by tomorrow.

14       Third, the defendant's request to equip voir dire

15  jurors with clear facemasks and make jurors pull down masks for

16  a few second during voir dire.

17       The jurors will have the KN95 masks and no other,

18  unless they're double masked.  My information about the basis

19  for the request about the jurors pulling down their mask is

20  that the lawyers have to pull down their masks.  I don't

21  believe that the lawyers will have to pull down their masks.

22       Motions *in limine*.

23       MR. BACHRACH:  Your Honor, may I be heard on that last

24  point?

25       THE COURT:  Yes.

1        MR. BACHRACH:  Thank you, your Honor.

2        The issue is that at one point during jury selection

3   on a normal jury selection pre-COVID, there comes a point where

4   the court asks the jurors to look at the defendant and the

5   parties and say is there anyone there that you know, anyone

6   that you recognize, and the parties do the same in looking at

7   the jurors.  The purpose of this is to ensure that neither side

8   knows a juror.

9        If we are all wearing facemasks when that happens, and

10  I understand that safety reasons for doing so, but if we are

11  all wearing facemasks when this happens, it becomes very

12  difficult to make that determination.

13       Earlier today, for example, when I entered court, I

14  came onto the 14th floor and an individual, a man with gray

15  hair said, "Michael, Michael how are you?"

16       And I looked at him and I had absolutely no idea who

17  it was.  It was Mr. Tagliaferro.  I'm not kidding.  It was

18  quite funny.  I should know him, but I did not recognize him.

19  If I can't recognize my own client, how can I or the jury be

20  expected to recognize him or me to recognize jurors.  And

21  there's always the possibility that even if a juror doesn't

22  recognize the three of us that we might recognize them.  But,

23  again, it can't be done when the facemasks are on.

24       That's why I was suggesting only for a few seconds, no

25  more than that, to lower the masks so that everyone can look at

1  each other and then put the masks back on so that we can, both

2  the jurors can see us and say we don't recognize anyone and we

3  can see them and say we don't recognize them.

4       THE COURT:  All right.  The application is denied.

5       With regard to the motions *in limine*, the Court is

6  going to preclude the admission of the 1997 federal conviction

7  for any purposes at trial and cross-examination and direct

8  examination of any third-party witnesses.

9       I am going to defer ruling on the evidentiary issues

10  regarding Mr. Tagliaferro's confidential informant status.  The

11  government may introduce evidence of kickback schemes with

12  personal injury law firms and with William Nicholas as both

13  substantive and impeachment evidence.  An opinion will be

14  following today; if not today, then tomorrow.

15       I am going to grant the sealing request with regard to

16  the materials filed just recently about Mr. Tagliaferro's

17  status as an informant.

18       That's the pretrial motions.

19       Mr. Schaeffer and Mr. Bachrach?

20       MR. BACHRACH:  Your Honor, just so I have clarity,

21  just so I am clear, so the government can introduce, for

22  example, the kickback scheme for any purpose, but you are

23  deferring for now on whether or not we could then introduce

24  evidence related to the confidential informant status, which

25  would be contradictory to that, at least on that as an example.

L3TNTAGC

1          Am I understanding correctly you haven't ruled on that

2    part yet?

3          THE COURT:  Yes.  I am deferring on that.

4          MR. BACHRACH:  OK.  Thank you.

5          THE COURT:  The issue you pose, Mr. Bachrach, is?

6          MR. BACHRACH:  The issue I pose, your Honor, if a

7    witness testifies, for example, that Mr. Tagliaferro was

8    involved in kickbacks, in a kickback law firm scheme, and he

9    does that in an effort to, for example, impeach

10   Mr. Tagliaferro's credibility, we should be able to say well,

11   wait a second, yes, he was involved in a kickback scheme, but

12   only as a confidential informant, and his role was acting as a

13   confidential informant at the time.

14         The witness, who is testifying to his belief, he may

15   have believed it was otherwise because he was involved in the

16   scheme or in other criminal conduct.  But the fact of the

17   matter is, as your Honor knows from the 3500 material we

18   provided under seal, Mr. Tagliaferro was acting as a

19   confidential informant with respect to that.  So if the

20   government is going to be able to have a witness claiming that

21   Mr. Tagliaferro's character can be attacked because he was a

22   member of this kickback scheme, we have to be able to defend

23   that and say, no, it wasn't.

24         THE COURT:  Mr. Schaeffer, what do you have to say

25   about that, or Mr. McKay.

L3TNTAGC

1          MR. McKAY:  If I may address this issue, your Honor.

2     Just two points of clarification we'd ask for.

3          First of all, with respect to what happens if we

4     cross-examine the defendant about the law firm kickback scheme,

5     we understand the defendant's position on that point, but it's

6     very difficult for us to respond to the proposition that it

7     would be fair game for them to then bring in information about

8     some confidential informant status, because the 3500 material

9     they disclosed to you in camera we have not yet received.  Once

10    they provide that to us, if they do, that may well moot the

11    issue.

12         If it shows what they say it shows, we may well decide

13    to take the whole issue off the table, and that would save the

14    Court and the parties some time arguing about this.  So we hope

15    that they'll turn that over in due course and we can decide

16    whether to moot this issue.

17         Then the second point on this is just we continue to

18    be a little bit confused about their position about the

19    government's opening the door.  We perfectly well understand

20    their point about the law firm kickback scheme and their

21    assertion that that would open the door to information about

22    the confidential informant status.  But in places in their

23    motion they seem to suggest that cross-examination about any

24    uncharged conduct would open the door to testimony about

25    confidential --

L3TNTAGC

1          THE COURT:  It wasn't clear to me based on the

2     positions taken by the government and Mr. Tagliaferro.  That's

3     why I said I was going to defer decision on this.  We will just

4     have to hear a little more and see a little bit more and I will

5     make my ruling.

6          MR. McKAY:  Understood, your Honor.

7          THE COURT:  If you get the 3500 material and you want

8     to make a further submission, that's fine with me.

9          MR. McKAY:  Understood.  Thank you, your Honor.

10          THE COURT:  Anything you want to point out about any

11     special requests for voir dire or preliminary instructions?

12          MR. SCHAEFFER:  We note that we have several

13     objections to the proposals from the defendant, and I'm happy

14     to run through them, your Honor.

15          THE COURT:  Yes.

16          MR. SCHAEFFER:  Before we do that, I think there are

17     just two things that we may want to address up front.

18          One is whether the defense is withdrawing their motion

19     to withdraw from this case.  Technically that is still pending

20     before the Court.  We think that should be resolved before we

21     actually proceed to trial.

22          The second matter, assuming that that is withdrawn or

23     resolved, is that we need to do the *Curcio* inquiry.

24          THE COURT:  Yes.

25          Mr. Bachrach?

1          MR. BACHRACH:  On the motion to withdraw, your Honor,

2     I believe our motion was to withdraw if the case wasn't

3     continued to April, and seeing as the case was continued to

4     April that was mooted.  We did renew our continuance motion,

5     which was separate from the motion to withdraw on Fifth and

6     Sixth Amendment grounds, and your Honor has denied that.

7          THE COURT:  I have ruled on that.

8          MR. BACHRACH:  Exactly.  That's my point.  Your Honor

9     has ruled on that.  So I don't think there's anything more that

10    needs to be done.

11         MR. SCHAEFFER:  I would just note that one of the

12    issues that they reraised for the Court was a conflict of

13    interest, so I wanted to be clear and make sure we had a record

14    that was clear that they are no longer seeking to withdraw.

15         THE COURT:  That's clear, isn't it, Mr. Bachrach?

16         MR. BACHRACH:  We are not seeking to withdraw, your

17    Honor.  That is absolutely true.  But we are foreshadowing the

18    fact that doing a trial in the midst of COVID, we hope it won't

19    happen, but could impact any attorney's effectiveness.  That is

20    all we were doing when we raised that objection at the time.

21    We still maintain it, but my understanding is your Honor has

22    denied it.

23         THE COURT:  You have made that motion, and I've ruled

24    on it.

25         MR. BACHRACH:  Exactly, your Honor.

L3TNTAGC

1      THE COURT:  That's the way life is, right?

2      MR. BACHRACH:  Exactly, your Honor.

3      THE COURT:  OK.

4      MR. SCHAEFFER:  We would ask your Honor if we could

5  proceed to the *Curcio* inquiry, and then I am happy to walk

6  through the government's objections to the voir dire requests.

7      THE COURT:  Mr. Bachrach, what about you?

8      MR. BACHRACH:  That's fine.

9      THE COURT:  All right.

10      Mr. Tagliaferro, I have some questions for you.

11      THE DEFENDANT:  Yes, sir.

12      THE COURT:  Have you talked with Mr. Bachrach and

13  Mr. Rosenberg about the *Curcio* hearing?

14      THE DEFENDANT:  I don't know what that means.

15      MR. ROSENBERG:  The insurance company paying.

16

17      THE DEFENDANT:  Oh, the insurance company paying.

18  Yes, I did, your Honor.

19      MR. ROSENBERG:  The insurance company paying.

20      THE COURT:  I have a few questions for you.

21      First of all, I want to ask you about your competence.

22      There's no doubt that Mr. Tagliaferro is competent, is

23  there?

24      MR. ROSENBERG:  No question, your Honor.

25      THE COURT:  OK.

L3TNTAGC

1          Mr. Rosenberg, should we swear Mr. Tagliaferro in for

2     this?

3          MR. ROSENBERG:  By all means, your Honor.

4          (Defendant sworn).

5          THE COURT:  OK.  Please sit down, Mr. Tagliaferro.

6          Make yourself comfortable.

7          Are you currently represented by Mr. Rosenberg and

8     Mr. Bachrach?

9          THE DEFENDANT:  I am, your Honor.

10          THE COURT:  How long have these two attorneys

11    represented you?

12          THE DEFENDANT:  Far too long, about 21 months.

13          THE COURT:  OK.  Are you satisfied with their

14    representation?  Are you satisfied with their representation?

15          THE DEFENDANT:  I'm thinking about wording.  I wish

16    this trial was over a year ago.

17          THE COURT:  I do too.

18          THE DEFENDANT:  They're doing the best that they could

19    do under the circumstances.

20          THE COURT:  Are you satisfied with them?

21          THE DEFENDANT:  As well as I could be, yes.

22          THE COURT:  OK.  Do you wish them to continue to

23    represent you?

24          THE DEFENDANT:  I do, your Honor.

25          THE COURT:  OK.  Have you paid these counsel, promised

1    to pay them for their services in this case?

2         THE DEFENDANT:  Well, they were paid through the

3    insurance company a great deal of money, and now they're

4    seeking more and I'm going to pay them, yes.  But, your Honor,

5    may I say something?

6         THE COURT:  Yes.

7         THE DEFENDANT:  I think it's unfair that as a

8    defendant that I was billed $120,000 because of COVID.  I

9    wanted this case to happen a year ago, and, quite frankly, I

10   never agreed to any delay, and I was told that I don't have the

11   right to agree or disagree.  It was a matter of the chief

12   justice.  But the insurance company got billed $120,000 during

13   that period of time and now quite frankly -- excuse me, sir.

14        THE COURT:  Do you want some water?

15        THE DEFENDANT:  Can I have a moment, please.

16        I put my family in debt to pay, and I will continue to

17   do so if need be.  I am an innocent person, and I want to be

18   proven innocent at trial.

19        THE COURT:  All right.  What is your understanding of

20   the fee arrangement.  How is it paid?

21        THE DEFENDANT:  I give them money.  He's asking for I

22   think $60,000 right now.  Quite frankly, I'm prepared today to

23   give him $30,000, and I got to make arrangements for the

24   following $30,000 because I just don't have it.

25        THE COURT:  Do you know how much money the insurance

1    company has expended?

2             THE DEFENDANT:  $200,000.  And the date, the first day

3    I was in court, I met with Mr. Rosenberg, and my wife, who is

4    greatly concerned, and said what are we going do with fees?

5    And his response was:  This covers $200,000.  We are not going

6    to go anywhere near that.  So money shouldn't be a concern.

7             And then COVID hit.  I do understand from

8    Mr. Bachrach, Mr. Rosenberg, and the staff were working, but

9    they weren't working on my behalf because I was ready, willing,

10   and able to come to court.  I am not afraid of COVID.  I am not

11   afraid of dying.  I was always ready, willing, and able.  And

12   so they continued to bill the insurance company every month,

13   some months as much as $29,000, and I didn't even come into

14   court.  I totaled it up last night.  It was like $120,000 due

15   to just COVID.

16            THE COURT:  Mr. Tagliaferro, let me ask you, are you

17   out of pocket any money or has this all been reimbursed by the

18   insurance company, paid for by the insurance company?

19            THE DEFENDANT:  No.  Today I am going to be out of

20   pocket $30,000, and then I am going to continue to owe him an

21   additional $30,000.  That would be $60,000 out of pocket that I

22   just don't have, your Honor.

23            I am a carpenter.  I have been working day and night

24   since I have been 14 years old and I don't have $60,000.

25            THE COURT:  I'm trying to understand.  The $200,000

L3TNTAGC

1    which is the insurance policy --

2            THE DEFENDANT:  Yes.

3            THE COURT:  -- as I understand it --

4            THE DEFENDANT:  Yes.

5            THE COURT:  -- that's been expended?

6            THE DEFENDANT:  Yes.

7            THE COURT:  You have no more money due from the

8    insurance company?

9            THE DEFENDANT:  No more money.

10           THE COURT:  And you are out of pocket for the legal

11   fees that you're paying to Mr. Rosenberg and Mr. Bachrach?

12           THE DEFENDANT:  Yes, your Honor.

13           THE COURT:  Well, Mr. Schaeffer and Mr. McKay, what's

14   the conflict now that it's been paid out?

15           MR. McKAY:  Your Honor, I think now that the insurance

16   policy has paid out, any fees expended going forward -- going

17   forward there is no potential conflict in the same way as when

18   the fees were being paid by the insurance company.  We think

19   the Court should still complete the inquiry at least

20   retrospectively with respect to the choices that have been made

21   during the period in which the insurance policy was covering

22   the fees, but, again, we think that's at most a potential

23   conflict and would be that is eminently waivable.

24           And I'll just note that the, sort of the comments by

25   the defendant about agreeing to delay is a separate subject.

1   We are happy to discuss it and make a record of the fact that

2   every single delay in this trial has been -- excuse me, every

3   single exclusion of time in this trial has been on consent,

4   many times with the defendant present at the time of the

5   consent.  And so I think that is perhaps trying to create an

6   issue for down the road, but with respect to the *Curcio*

7   inquiry, the questions of delay are, I think, separate.  The

8   only question is whether Mr. Tagliaferro wants to continue with

9   his present counsel.

10         THE COURT:  He said he did.  I asked him that

11   question, and he said he wanted to continue.

12         MR. McKAY:  Right.

13         THE COURT:  Mr. Rosenberg, do you want to continue as

14   his counsel?

15         MR. ROSENBERG:  Well, yes, your Honor.  I'm prepared

16   to go forward, of course.

17         THE COURT:  Subject to the objections that you've made

18   to going forward.

19         MR. ROSENBERG:  Subject to those objections, yes, but

20   of course I want to be comfortable that my client is satisfied

21   with counsel going forward.

22         THE COURT:  Mr. Tagliaferro, are you satisfied with

23   counsel going forward, Mr. Bachrach and Mr. Rosenberg?

24         THE DEFENDANT:  I am, your Honor.

25         THE COURT:  All right.  Now that the fees are

L3TNTAGC

1 expended, Mr. McKay, I don't see how there can be any conflict.
2 I don't see how there was any conflict.
3       MR. McKAY:  I think that's certainly right going
4 forward, your Honor.
5       THE COURT:  Retrospectively as well.
6       MR. McKAY:  Right.  As long as there's no claim by the
7 defendant that anything that happened in the past was the
8 result of some, you know, conflict of interest, and there has
9 been no such claim, I think that's right, your Honor.
10       THE COURT:  Yes.
11       You are satisfied with the services that they've
12 rendered to you, aren't you, Mr. Tagliaferro?
13       THE DEFENDANT:  Yes, sir.
14       THE COURT:  You are not complaining about anything
15 that Mr. Bachrach or Mr. Rosenberg did, are you, in their
16 representation of you?
17       THE DEFENDANT:  No, sir.
18       THE COURT:  All right.  I don't think I have to go
19 further with the *Curcio* hearing.
20       MR. McKAY:  I think that's sufficient, your Honor.
21       THE COURT:  All right.
22       Mr. Schaeffer, you had some things that you wanted to
23 bring to my attention?
24       MR. SCHAEFFER:  Yes, your Honor.  Several of the
25 proposed requests for voir dire we think are either redundant,

1  duplicative, or inappropriate.  I'm happy to walk through those

2  with the Court if that would be helpful.

3          THE COURT:  Yes, please.

4          MR. SCHAEFFER:  Beginning on defendant's proposed voir

5  dire, this is document 126 filed on ECF, on page 1, paragraph

6  1, I think this is just a matter of the parties kind of trying

7  to anticipate how long the trial will be --

8          THE COURT:  What are you reading from?  Voir dire and

9  directions questions?

10          MR. SCHAEFFER:  Yes.  Document 126, page 1.

11          THE COURT:  I'm sorry.  I don't have the document

12  number on the sheet.  Tell me again what you are looking at.

13  Voir dire questions?

14          MR. SCHAEFFER:  Yes.  This is defendant Salvatore

15  Tagliaferro's proposed voir dire.

16          THE COURT:  OK.  Go ahead.

17          MR. SCHAEFFER:  I am looking at page 1, paragraph 1.

18  I think this was just the parties attempting to anticipate the

19  length of trial, but it estimates the case at approximately

20  three weeks and indicates the Court will not be sitting on

21  Fridays.

22          I am not sure if that's accurate.  To the extent that

23  it is not, we think it should be conformed to the actual trial

24  schedule

25          THE COURT:  What is the trial schedule?

1          MR. SCHAEFFER:  I believe we are going to discuss that

2     today, your Honor, but my understanding is that we would be

3     sitting Monday through Friday at a predetermined time, and the

4     parties have estimated that the case will last no more than two

5     weeks.

6          THE COURT:  Certainly, I agree with the two weeks.

7          David, what's the schedule for the trial?  Is it 9:30

8     to --

9          THE DEPUTY CLERK:  9:45 to 3:45, Judge.

10         THE COURT:  9:45 to 3:45, five days a week.

11         MR. SCHAEFFER:  The government also believes that the

12    second portion of paragraph 1, which asks if there's any reason

13    related to COVID-19 that the juror could not sit, we think it's

14    duplicative of the next question, which also asks about

15    COVID-19 and also, frankly, your Honor, is duplicative of the

16    supplemental questionnaire that's been already sent to every

17    one of the jurors in the pool which the Court has seen in

18    connection with the JSSA motion that was made.

19         THE COURT:  OK.

20         MR. SCHAEFFER:  We do understand paragraph 2 may be

21    helpful for the jury, especially since the courtroom may look

22    different.  But looking at page 2, paragraphs 3 and 4, we think

23    ask somewhat invasive questions of the jury regarding their

24    medical condition and whether or not they have been vaccinated.

25    We don't think they are necessary in light of all the

L3TNTAGC

1  precautions that have been taken and we don't think they should

2  be asked.

3          THE COURT:  All right.

4          MR. SCHAEFFER:  With respect to paragraph 5.

5          THE COURT:  When I say "all right," I don't mean I am

6  agreeing with you; I mean I'm receiving the transmission.

7          MR. SCHAEFFER:  I understand, your Honor.

8          THE COURT:  I will let you know when I ask the voir

9  dire question, but I will note your objection.

10          MR. SCHAEFFER:  With respect to paragraph 5, we object

11  to this question.  This was also one of the arguments raised by

12  defense counsel in the motion which the Court has now denied.

13  We think that it should be removed for that reason.

14          THE COURT:  OK.

15          MR. SCHAEFFER:  With respect to paragraph 9 at the

16  bottom of this page, page 2, we think that this question is

17  redundant both of paragraph 8 and that it is just not necessary

18  to ask.  It is a bit invasive about prior plans and is

19  unnecessary.

20          We also believe that paragraph 10 is redundant and

21  unnecessary to ask.  We would also note that it's a bit vague

22  to the government.  We are not quite sure what that paragraph's

23  asking, but we would object to it regardless.

24          MR. SCHAEFFER:  Section 3, which begins on page 3 and

25  continues to page 4, captioned Nature of the Charges, the

1  government objects to that entire section.  In particular, it

2  objects to characterizing Mr. Tagliaferro's prior employment,

3  which are facts outside of the indictment, and also objects to

4  the characterization of the central claim underlying the

5  government's case which is inaccurate and misleading to the

6  jury.

7          THE COURT:  All right.

8          MR. SCHAEFFER:  The government objects to paragraph

9  18, which appears to be duplicative to paragraph 19, and also

10  suggests additional information about the defendant and his

11  prior employment and activities which we think is

12  inappropriate.

13          We also object to paragraph 23 on page 5, which we

14  think is unnecessary and an invasion of jurors' privacy.

15          MR. BACHRACH:  I'm sorry, which question?

16          MR. SCHAEFFER:  23.

17          THE COURT:  Go ahead.

18          MR. SCHAEFFER:  We think it is an invasion of privacy

19  and just unnecessary and irrelevant to ask about the jurors'

20  employment.

21          Then I would skip to page 8.  The government would

22  object to requests 49, 50, 51, and 53.  We think that all of

23  them are unnecessary and an invasion of the jurors' privacy.

24  We fail to see how the location of the parents' birth of the

25  jurors is relevant to any question that could be asked

1    properly.

2              Then the government also objects finally to 55, 56,

3    and 58 for substantially the same reasons.

4              THE COURT:  OK.

5              MR. SCHAEFFER:  Thank you, your Honor.

6              THE COURT:  Mr. Bachrach, do you want to be heard on

7    any of these objections plus any objection you have to the

8    government's voir dire?

9              MR. BACHRACH:  Yes, your Honor, on some of them.

10             I am just going to go in order, so I may be a little

11   repetitive.

12             THE COURT:  Yes, please.

13             MR. BACHRACH:  Obviously on 1 the defense has no

14   objection to the government's changes.

15             On No. 2, we think that question remains very

16   important, but we do think the question should be changed

17   because we listed three weeks and it is actually now going an

18   estimated length of two weeks.

19             On question 1, I should go back.  I should say, is

20   there any reason, including reasons related to the COVID-19

21   pandemic, that would make serving on a jury difficult for you?

22             If the government feels that's -- well, repetitive in

23   any way.  I would suggest, however, your Honor, that time

24   passes in between when they fill out the supplemental

25   questionnaire and when they arrive in court, and the purpose is

L3TNTAGC

1    to make sure that as of now, when they're being seated, that

2    they still have no objections.

3            However, there is no question at the end -- we had put

4    the hardship question, we had incorporated that into, because

5    we say both any reasons for COVID or hardship.  So it might

6    make more sense to simply put that question at the very, very

7    end, that last sentence of paragraph 1, at the very, very end,

8    so that at the very end of questioning the Court asks, Having

9    heard everything that you've gone through essentially, is there

10   anything else that we should be aware of that would make it a

11   hardship or would make you uncomfortable sitting as a juror,

12   because that's really what that is about.

13           THE COURT:  All right.

14           MR. BACHRACH:  Nos. 3 and 4, we don't view it -- I

15   mean, we are having a trial in the middle of a public health

16   crisis where apparently, as of yesterday's newspapers, New York

17   and New Jersey have the highest percentage of COVID in the

18   country.  I don't think it's unreasonable to ask jurors whether

19   they have been vaccinated, thus making everyone else safer.  I

20   also don't think it's unreasonable to ask the juror whether

21   they would be uncomfortable if a juror they were seated with

22   was not, because obviously that's going to be on people's

23   minds.  I don't think --

24           THE COURT:  You know we've conducted a number of

25   trials independent of vaccination.

1          MR. BACHRACH:  We have, and we had one juror, at least

2   one juror to my knowledge, that tested positive.

3          THE COURT:  Said he tested positive.

4          MR. BACHRACH:  I'm sorry?

5          THE COURT:  Said he tested positive.

6          MR. BACHRACH:  This is true, your Honor.  I haven't

7   seen his medical records.  That is true.  I understand he was

8   excused because of that.

9          THE COURT:  That's correct.

10         MR. BACHRACH:  But the point is -- and maybe your

11  point is actually even more important.  He said he did.  Well,

12  we don't know if he did.  Well, obviously he said he did,

13  because at the very least he was concerned to come into court

14  with COVID.

15         Well, that may be on the minds of other jurors as

16  well.  These questions are to try to root out jurors who,

17  because of COVID, would feel uncomfortable sitting as a juror.

18  We don't want jurors sitting on here who are going to be

19  looking at their clock the whole time, scared, and just wanting

20  to get out.  We want jurors who --

21         THE COURT:  You know Judge Rakoff impaneled a jury and

22  they had a jury trial for two or three weeks.  He tells me he

23  didn't ask a single question about COVID in the voir dire.

24         MR. BACHRACH:  I understand that, your Honor.  But

25  just because, respectfully, your Honor, just because a judge

L3TNTAGC

1  didn't do it doesn't mean that your Honor shouldn't do it.

2          THE COURT:  I understand.

3          OK.  What else do you have, Mr. Bachrach?

4          MR. BACHRACH:  OK.  Going to 8, 9 and 10.

5          So these are different questions, your Honor.  The

6  government's arguing they are duplicative, but they are asking

7  different things.

8          No. 8 is in essence asking whether they or anyone

9  close to them actually has worked in law enforcement.  That is

10  a fairly common question to be asking jurors to weed out bias.

11          The next one is not if they did work in it, but if

12  they were trying to work in it, if they applied.  Again, it's

13  distinction, but it is an important difference.  It is to weed

14  out bias.

15          No. 10, the government is confused by what we mean by

16  have you or anyone close to you ever had contact with law

17  enforcement?  Well, see, that is, of course, different than

18  whether you have applied for them or whether you have worked

19  for them.  That could mean whether or not you were arrested, or

20  whether or not you were the victim of a crime or had any other

21  reason to be interviewed by law enforcement.

22          Again, biases one way or the other can come up

23  throughout those interactions.  So we believe that is a very

24  appropriate question, and it is, again, a fairly common

25  question to ask.

1        With respect to the Section 3, the nature of the

2    charges, if the government is stating that we've misstated the

3    explanation of how they are going to put in their case, then

4    obviously we don't want to misstate their case.  We were trying

5    to summarize what we thought -- it was our understanding of

6    their case.  So we have no objection to a change to be more

7    accurate to the government's case if that's one they proposed.

8        No. 18 and 19, which goes to the fact -- the

9    defendant, of course, been charged or spent his year as a union

10    organizer and as a carpenter.  Wanting to know whether or not

11    jurors have a bias against those organizations we believe is

12    relevant, particularly because although the parties are going

13    to do a very, very -- they are going to try their best to keep

14    the specter of the Mafia and organized crime out of this case.

15    I believe both parties have been talking about trying to keep

16    that out.  Common knowledge in the city is that the Mafia and

17    organized crime have a long history in the unions, a real hold

18    on many unions, maybe not this one, but others.  And we want to

19    make sure that there are no jurors who look at Mr. Tagliaferro

20    with an Italian last name, and say this Italian last name

21    working in this business that's known to have the mob, we don't

22    want them biased into thinking that in some way he's part of

23    the mob, when he clearly is not and has never been accused of

24    it and isn't certainly accused of it today.  So we are trying

25    to weed out certainly that potential bias, but doing so in a

L3TNTAGC

1    way that doesn't draw attention to the worst specter that we

2    are trying to keep out of it, that both parties are trying to

3    keep out of the case.

4         THE COURT:  All right.  I have your point.

5         MR. BACHRACH:  23, the government is going to be -- it

6    is our understanding of the government's evidence that they are

7    going to be putting in evidence related to the ethical codes of

8    employees of Mr. Tagliaferro's union, ethical codes that

9    Mr. Tagliaferro was required to sign on to.  We believe that if

10   jurors have gone through that similar process that could affect

11   their view of the evidence, because they would have an

12   independent knowledge that might impact their view because,

13   what they have done may not necessarily be done in the same way

14   but they may substitute dispute their own knowledge for the

15   facts before them, your Honor.  That would be our concern, and

16   why we are trying to weed out again unintentional biases.

17        Going to 49 and 50, where were you born and where were

18   your parents born, these are fairly common questions, your

19   Honor, we are trying to find out background.  Learning where a

20   person is born informs a great deal about how a person, what a

21   person oftentimes believes or at least what they went through

22   in their life experiences.  It helps to understand --

23        THE COURT:  I don't have any trouble with where were

24   you born.

25        MR. BACHRACH:  OK.

1      THE COURT:  Where were your parents born is more

2   problematic.

3      MR. BACHRACH:  I can say through personal experience

4   that I was born in the United States, my parents were born in

5   Germany.  The fact my parents were born in Germany, that

6   informs me a great deal.  As a German Jew it's definitely made

7   a difference in my lifetime and upbringing, and I can see

8   where -- a child's background, where their parents come from,

9   informs them as well.

10      THE COURT:  I've never asked it, but I'll consider it.

11      MR. BACHRACH:  No. 53, whether they are working in

12   person or remotely.  The purpose of that question, if they have

13   been working remotely this whole time it could impact how they

14   feel coming into court for the first time and being around

15   people for the first time, whereas if they have been working in

16   person the whole time, then that wouldn't be a concern for the

17   juror.

18      So, again, we are trying to figure out things about

19   the jurors, trying to learn about their potential biases, but

20   also gain information that are race neutral bases to inform

21   peremptory strikes.

22      The name and general location of your employer.

23   That's just a fairly common question to ensure there's no

24   overlap with this case in any way.

25      And the questions about the spouse again, it's just --

1  it's trying to ensure, just like when you ask a client what do

2  you do for a living, you are asking what their spouse does for

3  a living, because you spend a lot of time with your spouse and

4  you learn a lot from them, and that could inform who you are.

5          Those are our positions, your Honor.

6          We have no objections over to the government's

7  questions.  I should say a lot of them are overlapping, but we

8  don't have an objection to the ones that the government

9  proposed.

10          THE COURT:  All right.

11          Any comments on the preliminary instructions?

12          MR. McKAY:  Sorry.  I don't think we've seen the

13  preliminary instructions.  Has the Court drafted preliminary

14  instructions?

15          THE COURT:  We prepared them.  I thought we sent them

16  out.  We haven't sent them out.  We'll send them out tomorrow.

17  You'll have them tomorrow.  If you want to comment on them,

18  you're welcome to comment.

19          MR. McKAY:  Thank you.

20          MR. BACHRACH:  Thank you, your Honor.

21          THE COURT:  You should know, when we get to the time

22  for jury deliberations, I send in a copy of my jury charge to

23  the jury.  I also send in one copy of the indictment.  So the

24  indictment has Counts Four and Five in it, which are no longer

25  applicable.  So put your heads together and come up with a new

L3TNTAGC

1    revised indictment containing Counts One, Two, and Three.

2                MR. SCHAEFFER:  Thank you, your Honor.

3                Then the government would just like to put on the

4    record that, while they have had informal discussions with

5    defense counsel regarding pretrial disposition in this matter,

6    the government has never extended a formal plea offer in this

7    case.

8                Then we just have a few quick questions for the Court

9    so that we make sure that we get materials to you --

10               THE COURT:  I saw a *Pimentel* letter.

11               MR. SCHAEFFER:  Yes, we did provide a *Pimentel* letter

12   on January 26, 2021.

13               THE COURT:  Nothing after that?

14               MR. SCHAEFFER:  No, your Honor.

15               THE COURT:  All right.

16               MR. SCHAEFFER:  And that *Pimentel* sets forth a

17   guidelines calculation with a sentencing range of 151 to 188

18   months.

19               THE COURT:  Correct.

20               MR. SCHAEFFER:  Beyond that, your Honor, we just have

21   a few questions for the Court on --

22               THE COURT:  Yes.  Go ahead.

23               MR. SCHAEFFER:  -- when the Court would like exhibit

24   and 3500 binders and how many copies the Court would like.

25               THE COURT:  I would like two copies.  You can do it by

L3TNTAGC

1    Wednesday, no later than Thursday.

2              MR. SCHAEFFER:  Certainly, your Honor.

3              THE COURT:  How voluminous are they?

4              MR. SCHAEFFER:  They are going to be somewhat large, I

5    believe, your Honor.

6              We haven't compiled them exactly yet, but there will

7    be several hundred pages of them.

8              THE COURT:  All right.

9              MR. SCHAEFFER:  Would the Court like 3500 for all

10   witnesses or just testifying witnesses.

11             THE COURT:  Just the testifying witnesses.

12             MR. SCHAEFFER:  That will significantly cut it down,

13   your Honor.

14             Then we have a brief matter to raise with the Court

15   concerning potential video testimony.  On that point I would

16   defer to Mr. McKay.

17             THE COURT:  Mr. McKay.

18             MR. McKAY:  Just to raise this for your Honor.

19   There's one government witness and one potential defense

20   witness for whom video testimony may be necessary.  We are in

21   discussions with defense counsel about whether each party

22   consents to the other party's proposed video witness and what

23   the logistics of that would be.  So far I think we're working

24   well together, and so there's nothing for the Court to decide,

25   but we'll certainly let you know if there is some dispute that

1    arises.  We just wanted to let you know there is a possibility

2    of at least one witness who would appear by video.

3              THE COURT:  Why are they appearing by video?

4              MR. McKAY:  It depends on which witness.  There is a

5    government witness whose mother-in-law in North Carolina had a

6    stroke, and he needs, along with his wife, to travel to North

7    Carolina to care for her.  We are hoping to arrange a way that

8    that's not necessary so that he doesn't have to testify by

9    video, but that's the circumstance there.

10             There is a potential --

11             THE COURT:  Where would the testimony take place?  In

12   the courthouse in North Carolina?

13             MR. SCHAEFFER:  We have not confirmed that yet.  If

14   the Court has any guidance or preference, we're happy to

15   conform with that.

16             THE COURT:  I think it would be better if you did it

17   in the courthouse.

18             MR. McKAY:  I think that's right.  Ensuring the

19   technological -- we don't have a guy in his basement trying to

20   figure out on his own laptop.  We would like to make sure

21   there's some technological assistance to make sure we don't

22   have a problem.  We talked to the IT folks here at the

23   courthouse about the different options, and we are working to

24   figure that out.  Hopefully we will avoid this entirely and

25   have the witness here in person, but we are still working on

L3TNTAGC

1    that.

2              THE COURT:  All right.

3              MR. McKAY:  With respect to the defense witness, I

4    believe the witness has actually tested positive for COVID.

5    So, although he's local, there would be an issue with him

6    coming to the courthouse, and therefore, again, the likelihood

7    of a video testimony if they call him.

8              THE COURT:  All right.

9              MR. BACHRACH:  Your Honor --

10             THE COURT:  What is the state of his illness,

11   Mr. Bachrach.

12             MR. BACHRACH:  He's quite ill, your Honor.  It's not

13   mild symptoms.  He has got bad pneumonia as well.  It is

14   unfortunately not a mild case.

15             It is a recent diagnosis, your Honor.  So while he

16   might be better -- if this was a three-week trial, it might be

17   plausible that maybe towards the end he might be available, but

18   now that we are looking at a one- to two-week trial

19   realistically I think don't think he would be recovered by that

20   point.

21             THE COURT:  I was looking at a two-week trial.  You

22   just said one to two weeks.

23             MR. BACHRACH:  The government's case is one week, and

24   it may spill into the second week.  And the defense case is no

25   more than one to two days.  But, in any event, he wouldn't be

1    outside the quarantine period in all likelihood.  Again, he is

2    quite sick right now.  So even the quarantine period counting,

3    I don't think it would even begin until he is fully recovered,

4    which he is not at this point.

5              THE COURT:  All right.

6              How many alternates do we need in light of the fact

7    that this is going to be a two-week trial.

8              MR. SCHAEFFER:  We would recommend four, your Honor,

9    just to be completely safe.

10             MR. BACHRACH:  We would agree, your Honor.

11             THE COURT:  Four.  How do you want me to impanel them?

12   Normally what I do is take the jury and get a jury of 12 and

13   establish that it is satisfactory and then impanel -- I guess

14   how many people do we have?  You would each have two peremptory

15   challenges.  So we would put in six more.

16             MR. SCHAEFFER:  We think that's right, your Honor.

17             THE COURT:  Mr. Bachrach, Mr. Rosenberg?

18             MR. BACHRACH:  I believe so, your Honor.  That's fine.

19             THE COURT:  Put in six and each of you would exercise

20   your two challenges.  That would leave two.  I guess we would

21   have to put in eight people.

22             MR. BACHRACH:  Your Honor, I guess there are normally

23   two alternates.

24             THE COURT:  Then I would have to put in eight.  If you

25   want to put in four alternates, I would have to put in eight.

L3TNTAGC

1          MR. BACHRACH:  Yes, your Honor.

2          MR. SCHAEFFER:  Yes, your Honor.

3          THE COURT:  What time should the jury show up on

4    Monday?

5          THE DEPUTY CLERK:  10:30, 11.

6          THE COURT:  What courtroom are we in?

7          THE DEPUTY CLERK:  26B.

8          THE COURT:  We are in 26B.  I suggest that each of you

9    go up to 26B and familiarize yourself with the layout.  If you

10   have any problems, let us know.

11         MR. BACHRACH:  Your Honor, if I may, what time would

12   you want the parties to arrive on a daily basis?  I know with

13   the courthouse there are procedures as to when people are

14   allowed to arrive at the same time as the jurors or not at the

15   same time as the jurors.  I don't quite know how the spacing

16   is.

17         THE COURT:  I am normally in the courthouse by 9

18   o'clock in the morning.  What I would prefer is, rather than

19   having sidebar conferences, we take things up in the morning or

20   at lunchtime or at the close of business so that you know where

21   you are going.

22         That would suggest to me that you ought to be here,

23   for a 9:45 start, you be here by 9:15.

24         MR. BACHRACH:  Is it acceptable, your Honor, if --

25   although I think I would endeavor to make it here at 9:15 every

L3TNTAGC

1    day as well, I have child care issues, so if I am delayed as

2    long as Mr. Rosenberg is here as lead counsel, that's

3    acceptable to you by 9:15.

4              THE COURT:  Yes.  That's acceptable.

5              MR. BACHRACH:  Thank you.

6              A similar question that the government asked:  With

7    respect to defense 3500 material, you know, we are still

8    deciding which witnesses to call, if any, but assuming we do,

9    when would your Honor like 3500 material from the defense?

10             THE COURT:  Well, I asked the government to produce it

11   by Thursday.  If you can produce it by Thursday, Mr. Bachrach,

12   I would appreciate it.

13             MR. BACHRACH:  Everything we have to that date we will

14   provide to your Honor on Thursday.  Thank you.

15             THE COURT:  On Friday I am going to observe.  It's

16   Good Friday.  So I won't be in the office until Monday morning.

17   So if you get it in on Thursday, that would be helpful.

18             MR. BACHRACH:  We will, your Honor.

19             THE COURT:  Thank you.

20             Is there anything else, Mr. Schaeffer or Mr. McKay?

21             MR. SCHAEFFER:  Nothing further from the government.

22             THE COURT:  Mr. Bachrach?

23             MR. BACHRACH:  Nothing else, your Honor.

24   Thank you.

25             THE COURT:  Thank you very much.

1              Thank you, Mr. Tagliaferro.

2              THE DEFENDANT:  Thank you, your Honor.

3              (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25