UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America,

v.                                    19 Cr. 472 (PAC)

Salvatore Tagliaferro,

*Defendant*.

## THE GOVERNMENT'S SENTENCING MEMORANDUM

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

Thomas McKay
Jarrod L. Schaeffer
Assistant United States Attorneys
    *Of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................ 1

I. The Defendant's Offense Conduct ........................................................................... 1

II. The Guidelines Calculation ..................................................................................... 3

III. The Court Should Impose a Substantial Sentence of Imprisonment and a Fine ...................... 9

IV. The Court Should Order Forfeiture ...................................................................... 13

V. The Court Should Order Restitution ...................................................................... 14

    A. Income Paid to the Defendant By the Union ..................................................... 15

    B. Expenses Incurred During the Union's Participation in the Investigation and Prosecution of the Offense ................................................................................... 17

CONCLUSION ............................................................................................................... 18

## TABLE OF AUTHORITIES

<u>Cases</u>

*Gall v. United States*, 552 U.S. 38 (2007) ...................................................................... 9

*Lagos v. United States*, 138 S. Ct. 1684 (2018) ............................................................ 17

*Libretti v. United States*, 516 U.S. 29 (1995) ................................................................ 13

*United States v. Afriyie*, 16 Cr. 377 (PAE), 2020 WL 634425 (S.D.N.Y. Feb. 11, 2020) .......... 17

*United States v. Amato*, 540 F.3d 153 (2d Cir. 2008) ................................................... 17

*United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011) ............................................. 15, 16

*United States v. Blount*, 291 F.3d 201 (2d Cir. 2002) ..................................................... 6

*United States v. Capoccia*, 503 F.3d 103 (2d Cir. 2007) ............................................... 13

*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005) ................................................... 10

*United States v. Garcia*, 413 F.3d 201 (2d Cir. 2005) ..................................................... 5

*United States v. Gaskin*, 364 F.3d 438 (2d Cir. 2004) ................................................... 5

*United States v. Gushlak*, 728 F.3d 184 (2d Cir. 2013) ................................................ 16

*United States v. Maynard*, 743 F.3d 374 (2d Cir. 2014) ............................................... 17

*United States v. Milstein*, 481 F.3d 132 (2d Cir. 2007) ............................................... 17

*United States v. Peters*, 732 F.3d 93 (2d Cir. 2013) ..................................................... 14

*United States v. Rattoballi*, 452 F.3d 127 (2d Cir. 2006) ............................................. 10

*United States v. Sapoznik*, 161 F.3d 1117 (7th Cir. 1998) ............................................ 16

*United States v. Skowron*, 839 F. Supp. 2d 740 (S.D.N.Y. 2012),
    *aff'd*, 529 F. App'x 71 (2d Cir. 2013) .................................................................. 15, 16

*United States v. Stevenson*, 834 F.3d 80 (2d Cir. 2016) ............................................... 14

*United States v. Treacy*, 639 F.3d 32 (2d Cir. 2011) .................................................... 13

<u>Statutes</u>

18 U.S.C. § 981 ................................................................................................................ 14

18 U.S.C. § 3553 ................................................................................................................. 3, 9, 10

18 U.S.C. § 3663A ............................................................................................................ 15, 17, 18

28 U.S.C. § 2461 ..................................................................................................................... 14

Rules

Federal Rule of Criminal Procedure 32.2 ....................................................................... 13

Other Authorities

U.S.S.G. § 2C1.1 .............................................................................................................. 3, 4, 5, 7

U.S.S.G. § 2X1.1 ...................................................................................................................... 4

U.S.S.G. § 3B1.1 .................................................................................................................. 7, 8

U.S.S.G. § 3B1.3 ............................................................................................................... 3, 4, 7

U.S.S.G. § 3D1.2 ...................................................................................................................... 4

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of defendant Salvatore Tagliaferro, which is scheduled for September 8, 2021.  As the evidence at trial established, the defendant abused his position of authority as a union officer and employee by serving as the ringleader of a long-running scheme to solicit and accept cash bribes from prospective union members in exchange for securing the bribe payors' admission into the union. The Probation Department recommends a sentence of 60 months' imprisonment and a fine of $10,000.  For the reasons that follow, although the Government is not seeking a sentence within the applicable Sentencing Guidelines range of 97 to 121 months' imprisonment,[1] it respectfully submits that a substantial sentence of imprisonment—at least as significant as that recommended by the Probation Office—is necessary to vindicate the purposes of sentencing, including the need for the sentence imposed to reflect the seriousness of the offense and provide deterrence.

## I.  The Defendant's Offense Conduct

The evidence at trial amply established the defendant's guilt of all crimes with which he was charged.  In brief, it proved that at all times relevant to this case, the defendant was the President of the Local 926 chapter ("the Local 926") of the United Brotherhood of Carpenters and Joiners of America (the "Union"), a position he had held since at least in or about 2011.  (PSR ¶ 14).[2]  The defendant also was a council representative and employee of the New York City

---

[1] As discussed *infra*, the Government agrees with the Probation Office's Guidelines calculation except in one respect, which results in a Guidelines calculation of 97 to 121 months' imprisonment as opposed to 121 to 151 months' imprisonment.

[2] "PSR" refers to the Probation Office's final Presentence Investigation Report dated August 18, 2021; "Tr." refers to the transcript of the defendant's trial; and "GX" refers to a government exhibit

District Council of Carpenters and Joiners of America (the "District Council"), a representative body comprised of nine individual local chapters of the Union, since at least in or about 2017. (PSR ¶ 14).  The Union rules and by-laws imposed on the defendant a duty to provide honest services to the Union and his local chapter. (PSR ¶ 17).

At a Christmas party in late 2017, the defendant and John DeFalco, an officer of another local chapter, discussed a scheme to exploit the defendant's position of power, whereby they would solicit and accept cash bribes from prospective union members in exchange for the defendant's use of his authority to admit the bribe payors into the Union.  (Tr. 263-65).  The scheme was simple.  DeFalco would recruit prospective members, often with the assistance of so-called "runners" like Matthew Keethe.  (Tr. 275-76).  DeFalco would collect the money, and then meet with the defendant and divide it evenly between them.  (Tr. 261).  The defendant would then use his exclusive control over admission into the Local 926 to ensure that the bribe payors were admitted. (Tr. 227-28, 274-75, 291, 294, 305, 341).

This scheme continued until spring 2019, when a federal investigation and the defendant's ultimate arrest brought it to an end.  During that period, membership in the Local 926 sky-rocketed, but the majority of those new members never obtained Union jobs in the following years.  (PSR ¶ 23; GX-601, 602).   During the scheme, the defendant and DeFalco received bribes from approximately 494 prospective union members; these bribes ranged from approximately $600 to $2,000 each, meaning that a conservative estimate of the total bribe payments is $296,400.  (*See* Part II.B, *infra*).

---

introduced at that trial.  Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and alterations.

## II.  The Guidelines Calculation

The PSR calculates a total adjusted offense level of 32, a criminal history category of I, and a resulting Guidelines range of 121 to 151 months' imprisonment.  (*See* PSR ¶ 94). Subsequent to the issuance of the final PSR, the Government identified what it believes is one likely error in that calculation—the inclusion of a two-level enhancement under U.S.S.G. § 3B1.3, which is precluded by Application Note 6 to the relevant Guideline, U.S.S.G. § 2C1.1.  (*See* PSR ¶ 45).  Without that enhancement, the applicable Guidelines range would be 97 to 121 months' imprisonment.  For the reasons that follow, the Probation Office's calculation is otherwise correct, and the objections that the defendant has posed to certain other aspects of that calculation should be rejected.  (*See* PSR at 23-29 (noting defendant's objections)).

### A.   The Defendant's Criminal History Category and Prior Convictions

The Probation Office correctly calculates that the defendant has zero criminal history points, and thus is in Criminal History Category I.  (PSR ¶ 56).  However, it bears noting that the defendant is not without prior convictions, having previously been convicted of Attempted Burglary in the Second Degree in 1982, Assault in the Third Degree in 1988, and Conspiracy to Transport Stolen Goods in 1997.  (PSR ¶¶ 53-55).  With respect to his most recent conviction, the defendant participated in a conspiracy to sell stolen merchandise, in which he and his co-conspirators stole several tractor trailers full of retail goods worth hundreds of thousands of dollars. (PSR ¶ 55).  The defendant was convicted in federal court in Brooklyn, and sentenced to 18 months' incarceration and three years' supervised release.  (PSR ¶ 55).

While the defendant's prior convictions and sentences are too old to merit consideration under the Guidelines, they nevertheless provide important context for the Court to consider in its analysis of the relevant factors under 18 U.S.C. § 3553(a).

3

B.    The Adjusted Offense Level

*The Base Offense Level:*  Pursuant to U.S.S.G. § 3D1.2(d), the defendant's convictions on Counts One through Three are grouped for purposes of the Guidelines, because those counts are predicated on acts and transactions connected by a common criminal objective and constituting part of a common criminal scheme or plan.  (PSR ¶ 40).  Pursuant to U.S.S.G. § 3D1.3(b), the offense guideline that produces the highest offense level applicable to Counts One through Three must be used, which in this case is U.S.S.G. § 2C1.1—the offense guideline that applies to the honest services wire fraud charge.  (PSR ¶ 40).  Thus, pursuant to U.S.S.G. §§ 2X1.1 and 2C1.1(a)(2), the base offense level applicable here is 12.  (PSR ¶ 41).  As the Probation Office found, that base offense level is then properly subject to a number of enhancements based on the specifics of the defendant's criminal conduct.

*More Than One Bribe:*  First, pursuant to U.S.S.G. § 2C1.1(b)(1), the base offense level is increased by two levels because the offense conduct involved more than one bribe.  (*See* PSR ¶¶ 27, 42).  The defendant did not contest the PSR's application of this enhancement, conceding that the offense involved at least "238 to 250" bribes, but objecting to the PSR's statement that the offense involved approximately 494 bribes.  (*See* PSR at 28).  Although this enhancement applies either way, the evidence at trial did establish that the defendant's scheme involved at least 494 bribe payors.  Among other things, the Government entered into evidence handwritten lists of individuals admitted into the Local 926 that were sent to Tina DiGregorio by the defendant and DeFalco over the course of the scheme, which collectively contained 494 names.  (*See* GX-200D-200J, GX-200A-200C).  At trial, DeFalco testified that the names on those lists were all people who had paid bribes.  (*See* Tr. 296-306).  Corroborating the fact that 494 people paid bribes, the evidence at trial proved that approximately 866 individuals joined the Local 926 during the period of the scheme, (*see* GX-107, 601), and that more that 450 of those new members never worked a

4

*single hour* at a union job, demonstrating that they had not in fact obtained employment prior to joining, as required, and suggesting that they gained entry to the union through unlawful means, (*see* GX-108A, 602).

The defendant's argument to the contrary is based on testimony from DeFalco who, when asked how many people had paid him bribes to be admitted to the Union, responded "238 to 250 people." (Tr. 306). Given the documentary evidence of significantly more bribe payors than that, however, DeFalco's estimate appears to have undercounted the actual number of bribe payors.[3] Between the documentary evidence, (*see* GX-200D-200J, GX-200A-200C), DeFalco's confirmation that the 494 individuals reflected in those lists paid bribes (Tr. 296-306), and the membership records that tend to corroborate that testimony, (*see* GX-107, 108A, 601, 602), the Court should find by a preponderance of the evidence that the actual number of bribe payors was at least 494 individuals. *See, e.g.*, *United States v. Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005) (at sentencing disputed facts need only be proven by a preponderance of the evidence); *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004) (sentencing court may base factfinding on circumstantial evidence and reasonable inferences drawn therefrom).

*Value of Bribe Payments:*  Next, pursuant to U.S.S.G. § 2C1.1(b)(2), and the table set forth in § 2B1.1, the base offense level is increased by 12 levels because the value of the bribe payments involved in this scheme exceeded $250,000. (*See* PSR ¶¶ 27, 43). As noted above, the evidence

---

[3] To be clear, the Government is not arguing that DeFalco intentionally underestimated the total number of bribe payors. He had no incentive to do so, especially given that he separately testified that all of the names on the list (which included more names than his estimate, but which he apparently never tallied) were bribe payors. (*See* Tr. 296-306). It is hardly surprising that, given the wide-ranging scale of this scheme, a witness incorrectly recalled the total number of people who paid bribes over the course of a period lasting more than a year. Nor is a precise recollection dispositive or necessary to resolve a factual dispute where, as here, there is documentary evidence—endorsed by that same witness—that provides greater precision.

at trial showed that the actual number of bribe payors was at least 494 individuals.  Matthew Keethe testified that the amount each bribe payor was charged ranged from approximately $800 to $1,500 over the course of the scheme.  (Tr. 127).  DeFalco testified to a similar, but slightly broader range, stating that the amount of the bribes charged ranged from $600 to $2,000.  (Tr. 277, 297, 357-58).  Even assuming the lowest bribe amount reflected in the record ($600), the evidence thus established that, at a minimum, the total amount of bribes paid to the defendant and DeFalco was at least $296,400 (*i.e.* $600 multiplied by 494 bribe payors).  Accordingly, the Probation Office's calculation that the total bribe amount was at least $250,000 but less than $550,000 (*see* PSR ¶¶ 27, 43) is a conservative estimate firmly grounded in the evidence presented at trial.  *Cf. United States v. Blount*, 291 F.3d 201, 215-16 (2d Cir. 2002) (in making such calculations for Guidelines purposes, court is not obligated to accept the low end of a range estimated by a witness).

Objecting to this enhancement, the defendant relies on DeFalco's estimate that he received approximately $71,000 during the course of the scheme, arguing that the total value of the bribes cannot exceed $142,000, given that DeFalco testified he and the defendant evenly split the proceeds.  (*See* PSR at 26-27; *see also* Tr. 307).  However, DeFalco's estimate of the total amount of bribe proceeds ($142,000) is roughly consistent with multiplying his estimate of the total number of bribes (238 at the low end) with the price per bribe ($600 at the low end).  Since the total number of bribes was in fact 494, as the documentary evidence established, the better estimate of the total value of the bribes is $296,400  The Court should therefore find by a preponderance

of the evidence that the total amount of the bribes paid during the course of the scheme was approximately $296,400, and increase the defendant's offense level by 12 levels.[4]

*Abuse of Position of Trust:*  The PSR applies a two-level enhancement pursuant to U.S.S.G. § 3B1.3, because the defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense.  (PSR ¶ 45).  While the defendant's conduct was indeed an abuse of his position and a betrayal of trust consistent with that application of the enhancement in many similar contexts, here the bribery Guideline that sets the base offense level appears specifically to preclude its application.[5]  *See* U.S.S.G. § 2C1.1 app. n.6. Thus, the Government does not seek its application here.

*Leadership Role:*  Finally, pursuant to U.S.S.G. § 3B1.1(a), the defendant's offense level is further increased by four levels because the defendant was an organizer or leader of the criminal activity charged in the Indictment, which involved five or more participants and was otherwise extensive.[6]  (PSR ¶ 46).  In determining whether a defendant is an "organizer or leader," as opposed to simply a manager or supervisor, the sentencing court should consider factors such as:  "the exercise of decision making authority, the nature of participation in the commission of the offense,

---

[4] If the Court were to instead accept the defendant's position that, based on DeFalco's testimony, the total value of the bribes was approximately $142,000, then the offense level would be increased by eight levels, rather than 12.  The Government notes that, even were the Court to calculate the Guidelines in that manner, the Probation Office's sentencing recommendation still falls below the resulting Guidelines range.

[5] The defendant has not objected to the application of this enhancement by the Probation Office.

[6] There is no question that the scheme involved five or more participants, given the evidence at trial directly implicating at least the defendant, DeFalco, DiGregorio, Keethe, and William McDonald.  Likewise, there is no dispute that the scheme was "otherwise extensive," because it involved hundreds of bribe payors.  *See* U.S.S.G. § 3B1.1, app. n.3 ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.").

the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1, app. n.4.

Here, the evidence at trial easily established that the defendant was a leader of an organization that involved five or more participants.  Both DeFalco and Keethe testified that the defendant was *the* leader of the scheme—even discussing on a recorded call how the defendant was the "ringleader" (GX-301F)—and DeFalco further recounted how the defendant gave him directions and controlled the scheme.  (*See, e.g.*, Tr. 138-40, 153-54, 156-58, 264-65, 273-77, 312-14).  DeFalco also testified that the defendant gave directions to DiGregorio, an unindicted co-conspirator.[7]  (*See, e.g.*, Tr. 293-94).  The nature of the defendant's participation in the offense also supports the enhancement; by virtue of his role, the defendant was indispensable to the scheme as only he could ensure that bribe payors were admitted to the Local 926.  As DeFalco correctly explained, "[I]t's his local, it's his authority to put members in.  He's responsible for anything that goes on at the local, any decisions."  (Tr. 341).  Further supporting this enhancement, the defendant split the *entire* proceeds of the crime along with DeFalco (Tr. 282), and the defendant was principally responsible for planning and organizing the offense, having proposed the scheme to DeFalco in the first place at a 2017 Christmas party.  (Tr. 264-65).

Accordingly, the Court should find that adjusted offense level is 30.

---

[7] The defendant previously suggested in his objections to the Probation Office that the Government did not allege at trial that DiGregorio was involved in the conspiracy.  (*See* PSR at 27).  That is incorrect.  DiGregorio was referenced in the indictment as an unindicted co-conspirator (*see* PSR ¶ 25), and DeFalco testified at trial that she was involved in the scheme, (*see* Tr. 292-93).

C.    The Applicable Sentencing Range

Based upon the foregoing calculations, the defendant's sentencing range is 97 to 121 months' imprisonment.[8]

## III.  The Court Should Impose a Substantial Sentence of Imprisonment and a Fine

### A.    Sentencing Principles

Section 3553(a) of Title 18, United States Code, provides that the sentencing "court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth specific considerations, including:  the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the defendant's need for rehabilitation; the kinds of sentences available; the need to avoid unwarranted disparities in the sentences imposed on similarly situated defendants, and the sentencing range under the Guidelines. *Id.*

The Guidelines range itself continues to be an important sentencing factor.  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), the Court must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceeds.  *Id.* at 49; *see also United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir.

---

[8] Assuming *arguendo* that the Court were to agree with the defendant's position on the value of the bribes, his offense level would be reduced by four points, yielding a recommended sentencing range of 63 to 78 months' imprisonment.

2006) (the Guidelines "cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges"); *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and Section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").

### B.   Discussion

A substantial sentence is necessary to reflect the seriousness of the defendant's crimes and the grave breach of trust those crimes represent.  As a Union officer and employee, the defendant pledged to act in the best interests of the Union and his members.  He was supposed to use his power to help Union members find jobs and earn a decent wage for their labor.  He violated that trust by acting in his own interests, using his power to line his own pockets at the expense of the very people he had pledged to serve.

The defendant's actions caused harm to both the Union and to individuals.  As to the Union, the defendant's corruption tarnished its name and reputation, and undermined its ability to faithfully tell its members that it was representing their interests.  As to individuals, the defendant shook down *hundreds* of prospective union members for hundreds—and sometimes thousands—of dollars in bribe payments.  Those prospective members typically were individuals having trouble finding steady work in other trades, such as the many Sandhogs who were out of work after certain major tunnel projects were completed.  They were men and women who wanted to earn a decent wage to provide for their families, who saw membership in the Union as a way to achieve that goal.  But without qualifying employment, they lacked the ability to enter the Union—at least

10

through local chapters, like the Local 157, which required a letter of employment.  So the defendant offered them a shortcut to a valuable Union book.

But in light of the defendant's actions, the promise of employment represented by that book proved to be hollow.  As the evidence at trial established, more than 50% of the members who joined the Local 926 during the relevant period never worked a *single hour* during the following years.  Another 26% worked less than 500 hours.  (*See* GX-602).  That is, with so many new members flooding into the Union from the defendant's scheme, there simply was not enough work to go around, and individuals who had paid bribes in the hope of obtaining work were left with only a plastic card to show for it.  The defendant, by contrast, was left about $150,000 richer.[9]

This was a premeditated crime of greed.  The defendant hatched his scheme in late 2017, at a time when he was in need of money.  (*See* Tr. 264; GX-400B).  He solved his own money problems by taking cash from the men and women he was supposed to be serving, using it to pay off his loans.  At trial, the defense gallingly suggested that this scheme was good for the Union, but any claim that the defendant was acting in the Union's interest by simply attracting new members is meritless.  Not only did these new members not get Union jobs, which as Matthew Walker explained was detrimental to the Union's true interests (*see* Tr. 68), it glosses over what actually occurred—stated plainly, if attracting new members was truly the defendant's goal, there was no need whatsoever to wring bribes from prospective members in the process.

The defendant's conduct was not an isolated incident.  It was a long-running scheme, planned by the defendant in late 2017 and executed over the course of more than a year.  Week

---

[9] Because the defendant profited from his crimes (at the expense of prospective members), this Court should impose not only forfeiture and restitution, *see* Parts IV and V, *infra*, but also a fine, as recommended by the Probation Office.

after week after week, he and DeFalco collected bribes, met to split up the cash, and admitted new members to the Union.  Even when they got wind of a possible investigation, they *still* pressed forward, seeking to conceal their conduct by changing their process and talking in code.  (*See, e.g.*, GX-203 (coded text messages about "tickets" to a "film festival" and reducing the number of individuals admitted per week)).  Indeed, the defendant ceased his criminal activities only when federal investigators approached him and seized his cellular phone.  (Tr. 335).  To date, the defendant has shown no remorse for his conduct.  He has refused to take responsibility for his part in the scheme.  And he has offered no indication whatsoever that he would not have continued committing crimes had he not been caught.

A substantial sentence of imprisonment is also necessary to promote both specific and general deterrence.  With respect to the defendant specifically, this is his fourth criminal conviction and his second federal conviction.  This distinguishes him from many other bribery defendants, who often seek leniency at sentencing based on an argument that the crime was an aberration from an otherwise law-abiding lifestyle.  It must be made clear to the defendant that his criminal actions have serious consequences—particularly given his steadfast failure to accept responsibility for his crimes.  More generally, a substantial sentence of imprisonment is necessary to deter union officials and other individuals in similar positions of trust from abusing their power.  The defendant's conduct here is a powerful reminder of the need for general deterrence.  His scheme was hardly original; many union officials before him have abused their power for personal gain in similar ways.  Yet, as here, such schemes also may persist undetected for some time, until hundreds of individuals have already been extorted.  A message must be sent to other would-be corrupt officials that their actions will have criminal consequences.

Corruption takes things that are supposed to be good and taints them.  As a Union official and President of his local chapter, the defendant was entrusted with power and authority.  That power and authority flowed from the trust of other Union members, and was supposed to be used for good:  to help the defendant's members provide for their families.  By abusing that position to line his own pockets, the defendant tainted his office and his Union.  Crimes like the defendant's are corrosive to trust and integrity, breeding cynicism and mistrust—about unions, about officials in positions of power, and about commitment to the common good.  And such cynicism and mistrust causes real harms, impairing unions' ability to serve their important public role.  The defendant did not care about that.  He only cared about himself and the money.  He should be punished accordingly.

## IV.   The Court Should Order Forfeiture

Federal Rule of Criminal Procedure 32.2(b)(1)(A) requires that, "[a]s soon as practical after a verdict . . . of guilty," the Court "determine what property is subject to forfeiture under the applicable statute." *Id.*  Where, as here, "the [G]overnment seeks a personal money judgment, the [C]ourt must determine the amount of money that the defendant will be ordered to pay." *Id.*  "The [C]ourt's determination may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).  Notably, "[t]he calculation of forfeiture amounts is not an exact science." *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011).  The Court is only required to "make a reasonable estimate," based on "the available information." *Id.*  And because forfeiture is "an aspect of sentencing," *Libretti v. United States*, 516 U.S. 29, 49 (1995), "[s]entencing courts determine forfeiture amounts by a preponderance of the evidence," *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007).

13

Here, as a result of committing the offenses charged in the Indictment and pursuant to 18 U.S.C. § 981(a)(1)(C),[10] the defendant must forfeit to the Government "[a]ny property, real or personal, that constitutes or is derived from proceeds traceable" to the commission of his offenses. As relevant here, "proceeds" is not limited to profits, but may include the gross receipts from the offense. *See United States v. Peters*, 732 F.3d 93, 99 (2d Cir. 2013). As discussed above, even assuming the lowest bribe amount reasonably supported by the record—*i.e.* $600—the evidence at trial established that, at a minimum, the total amount of bribes generated during the course of this scheme was at least $296,400 (*i.e.* $600 multiplied by 494 bribe payors), and potentially much more. (*See* Tr. 277, 297, 357-58; GX-200D-200J, GX-200A-200C). As the leader of the scheme, the defendant had control over all proceeds it generated, and in many instances he had actual possession of those proceeds. Accordingly, the defendant should be required to forfeit the entire amount—$296,400—raked in during his scheme.

## V. The Court Should Order Restitution

The primary victim in this case is the Union, including the District Council and the Local 926, which was deprived of the defendant's honest services as an officer and employee during the course of this scheme. (PSR ¶ 36). As reflected in the attached submission from the Union, it is seeking restitution in the amount of $145,065.33, which represents (a) repayment of a portion of the defendant's income from the Union, and (b) reimbursement of expenses incurred by the Union during its participation in the investigation and prosecution of this case. The Government addresses each request in turn.

---

[10] "While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal proceedings via 28 U.S.C. § 2461(c)." *United States v. Stevenson*, 834 F.3d 80, 85 (2d Cir. 2016).

A.   <u>Income Paid to the Defendant By the Union</u>

Pursuant to the Mandatory Victim Restitution Act ("MVRA"), for specified crimes and "[n]otwithstanding any other provision of law, . . . the court shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense . . . ."  18 U.S.C. § 3663A(a)(1).  Honest services wire fraud is one such crime.  *See id.* § 3663A(c)(1)(A)(ii) (mandating restitution for "an offense against property under this title . . . including any offense committed by fraud or deceit"); *United States v. Bahel*, 662 F.3d 610, 649 (2d Cir. 2011).  A "victim" is an individual or entity "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," which "includ[es], in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," an individual or entity "directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  *Id.* § 3663A(a)(2); *United States v. Skowron*, 839 F. Supp. 2d 740, 745 (S.D.N.Y. 2012), *aff'd*, 529 F. App'x 71 (2d Cir. 2013) (finding, in a case involving honest services wire fraud, that the defendant's employer was a victim under the MVRA because his conduct "deprived Morgan Stanley of the honest services of its employee, diverted valuable corporate time and energy . . . , and injured Morgan Stanley's reputation").

As relevant here, a portion of money previously paid to the defendant for the performance of his honest services may be recovered through restitution.  *See, e.g.*, *Bahel*, 662 F.3d at 649 (analyzing restitution under the MVRA and stating "[t]here is no question that a portion of an individual's salary can be subject to forfeiture where, as here, an employer pays for honest services but receives something less"); *Skowron*, 839 F. Supp. 2d at 750 (citing *Bahel*) ("Money paid in salary is property.").  Here, money that the Union paid to the defendant in the form of a salary or stipend "[i]s plainly 'property' that belonged to the [Union], at least some of which the [Union] lost as a result of [the defendant]'s offense, since the [Union] paid him for his honest services,

15

which is what he failed to provide." *Bahel*, 662 F.3d at 648-49.  In such cases, "[t]he proper amount of restitution is the amount wrongfully taken by the defendant." *Id.* at 650.

Since the precise amount wrongfully appropriated by a corrupt defendant can be difficult to determine, however, and because courts are required to calculate only a "reasonable approximation of [a victim's] losses supported by a sound methodology," *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013), in other cases courts have ordered defendants to pay a percentage of their prior compensation as restitution.  *See, e.g.*, *Skowron*, 839 F. Supp. 2d at 751 (quoting *Bahel*, 662 F.3d at 649) (noting that courts "have awarded between 10% to 25% of the defendant's compensation to the employer, representing 'the difference in the value of the services that [the employee] rendered [the employer] and the value of the services that an honest [employee] would have rendered'"); *see also United States v. Sapoznik*, 161 F.3d 1117, 1121-22 (7th Cir. 1998) (finding that, "[g]iven the difficulty of estimating the loss that he actually imposed on the city," the district court permissibly "ordered him to pay back only one year's salary, that is, one fourth of his total salary from the town," which, "[a]lthough . . . an arbitrary fraction, . . . rather generously credit[ed] Sapoznik with being worth to the employer three-fourths of his salary even though he was corrupt").

In this case, the jury found that the defendant participated in a conspiracy to commit honest services wire fraud from at least January 2018 through his resignation in June 2019.  Consistent with the foregoing case law, the Union should be permitted to recover 20% of the salary and

stipends paid to the defendant by the District Council (approximately $64,707.11) and the Local

926 (approximately $1,350) during that time period.  (*See* Ex. A).[11]

    B.   Expenses Incurred During the Union's Participation in the Investigation and
           Prosecution of the Offense

The MVRA also requires that a defendant reimburse a victim for "necessary . . . other

expenses incurred during participation in the investigation or prosecution of the offense or

attendance at proceedings related to the offense."  18 U.S.C. § 3663A(b)(4).  Such "other

expenses" may include attorneys' fees, *see United States v. Amato*, 540 F.3d 153, 159 (2d Cir.

2008), so long as those fees were incurred in connection with a government investigation and

criminal proceeding, and not a private investigation that the victim chose to conduct on its own,

*see Lagos v. United States*, 138 S. Ct. 1684, 1690 (2018).  Generally, the Second Circuit takes a

broad view of what expenses are 'necessary.'"  *United States v. Maynard*, 743 F.3d 374, 381 (2d

Cir. 2014).  And as noted above, this court has "broad discretion to determine restitution," and

must make only a "reasonable estimate" of a victim's loss "based on the evidence before it."

*United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007).

Here, the Union seeks reimbursement of certain categories of attorneys' and related fees

that it incurred in connection with the federal government's investigation of this matter and

resulting prosecution of the defendant.  (*See* Ex. A).  Attorneys' fees incurred by the Union in

responding to subpoenas and requests for information issued by the Government in its criminal

---

[11] Exhibit A, appended to this submission pursuant to Rule 6.F. of the Court's Individual Practices, is a letter from the Union setting forth its calculation of the relevant restitution amounts.  The Union also provided with its letter exhibits supporting those calculations, which contain a range of records, including, among other things, pay schedules and attorney billing records.  Given their contents, the Government has requested to file the letter's exhibits under seal with the Court, and will confer with counsel for the Union and the defendant to determine what records may be publicly filed, whether in full or redacted form.

investigation are plainly compensable. *See, e.g.*, *United States v. Afriyie*, 16 Cr. 377 (PAE), 2020 WL 634425, at *2 (S.D.N.Y. Feb. 11, 2020). The same is true of expenses related to time spent by witnesses (and their attorneys) attending interviews with prosecutors and preparing for trial testimony at the Government's request. *Id.* Finally, although not incurred by virtue of any Government request or action, the Union's expenses incurred in moving to quash the Rule 17 subpoena served by the defendant upon the Union also appear to qualify as "expenses incurred during participation in the . . . prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). Accordingly, the Court may order restitution in the amount sought by the Union.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a substantial sentence of imprisonment is necessary to reflect the purposes of sentencing. The Government further submits that the Court should impose a fine, and order forfeiture in the amount of $296,400 and restitution to the Union in the amount of $145,065.33.

Dated:   New York, New York
          September 2, 2021

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney
                                        Southern District of New York

                                  By: _____/s/_____
                                        Thomas McKay
                                        Jarrod L. Schaeffer
                                        Assistant United States Attorneys
                                        Tel.: (212) 637-2268 / 2270